WILLIAM McCLURE, Appellant, *v.* THE CENTRAL TRUST COMPANY OF NEW YORK, Respondent, Impleaded with H. H. WARNER.

1. CONTRACT — CONSTRUCTION OF PROSPECTUS OFFERING STOCK FOR SUBSCRIPTION. A prospectus issued by a firm of bankers stating, among other things, that they were authorized, but by whom it did not appear, to offer for subscription stock of an English corporation consisting of 10,000 full paid and non-assessable shares represented by trust company certificates of the Central Trust Company of New York against which certificates a like number of preferred shares of the English company had been deposited, dividends payable at Central Trust Company, New York, and which, with a specified exception, comprises all stock held in this country for sale; that trust company certificates have been issued to comply with the requirements of this market; that subscription lists would be opened by the bankers, the Central Trust Company and the Bank of North America, from whom prospectuses and blank forms of application can be obtained; that receipts will be given for all payments made and engraved trust company certificates issued by the Central Trust Company will be delivered as soon as practicable after the making of the final payment — "Registrar of Certificates Union Trust Company, New York; transfer agents Central Trust Company, New York," which prospectus was issued with the knowledge of the Central Trust Company, allowed to remain on its counters for distribution and under which it received subscriptions for the stock, constitutes it a depositary of the shares of stock in the English corporation so deposited with it, and offered for sale by the bankers for an undisclosed owner, against which it is to issue certificates for the purpose of making the stock marketable in this country and is to act as agent for the transfer of the same as well as to receive applications for the sale of the stock.

2. Trust Company Certificates Representing Shares of Stock in Foreign Corporation — Implied Warranty to Deliver Marketable Stock Free from Lien. A trust company which, acting as such transfer agent in consideration of an annual salary, issues under such prospectus its certificate stating that there has been deposited with it in trust a certain number of shares of the stock of the English corporation and providing that such shares, together with a deed of transfer thereof, will be delivered to the person to whom the certificate is issued, or his assigns, on the surrender of the certificate and, until surrender, all dividends collected upon said shares by it will be paid to the registered holder or his order, impliedly agrees to deliver to one, who relying upon the statements set forth in the prospectus, was induced to become a certificate holder, marketable stock free from lien, and an effective deed of transfer thereof.

3. Stock Subject to Express Lien Created by Transferrer and Thereby Rendered Valueless, Not a Good Delivery under Prospectus. The obligation of the certificate is not discharged by the delivery or tender to such holder of a deed of transfer signed by the person in whose name the stock stands on the books of the corporation "subject to the several conditions on which I held the same immediately before the execution hereof and the said transferee doth hereby agree to accept and take the said shares subject to the conditions aforesaid " accompanied by the shares of stock therein mentioned, in the form of a certificate issued by the English corporation for the number of shares required, it appearing that the transferrer had created an express lien upon the shares and dividends by pledging them to two directors as trustees for the English corporation as collateral security for a debt owing by him to the corporation and had charged the shares with its payment and had agreed that all dividends payable thereon as well as those on other shares registered in his name should be applied upon his indebtedness and it also appearing that the shares were issued by the corporation subject in express terms to its articles of association and regulations which among other things provided that the company should have a first and paramount lien upon the shares registered in the name of any member for his debts, liabilities and engagements to or with the company — that such lien should extend to all dividends declared on such shares — that all dividends declared upon any shares might be retained by the directors and applied upon any lien held by the company and also authorized the company to refuse to register transfers of stock until its claims against the transferrer were satisfied — and that the shares were valueless by reason of such express lien — where the trust company knew but the person to whom it issued the certificate did not know although he made no inquiry as to its form or upon any other subject that the shares in its possession were issued by the corporation subject in express terms to its articles of association and that the deed of transfer was subject to the several conditions on which the transferrer held the shares immediately before the execution thereof and also

contained a covenant on the part of the transferee to accept and take the said shares subject to the conditions aforesaid.

4. IGNORANCE OF TRUST COMPANY AS TO EXISTENCE OF LIEN WILL NOT RELIEVE IT FROM LIABILITY. The fact that the trust company did not know at the time the certificate holder subscribed for his stock that there was any lien upon the shares sought to be delivered and did not discover it until long afterwards, will not relieve it from liability because, under the circumstances, the law imputed to it the duty of inquiring to see whether there was anything behind the conditions appearing on the face of the papers in its possession which would make the shares unmarketable before it undertook to place them upon the market under the sanction of its name and the confidence invited by its standing and it is chargeable with notice of the lien, since a proper inquiry at the proper place would have disclosed its existence and would have protected the trust company from being imposed upon itself and from unintentionally imposing upon others.

5. THE RULE OF CAVEAT EMPTOR NO PROTECTION TO TRUST COMPANY — THE DOCTRINE OF IMPLIED WARRANTY AS AN EXCEPTION TO RULE. The trust company will not be protected from liability by invoking the rule of *caveat emptor,* since from the nature of the transaction and the relative situation and circumstances of the parties the certificate holder paid for stock not of any particular market value but unincumbered stock, of the same value as free shares, such as persons of ordinary intelligence would understand was meant by the general description of stock shares the owner of which, and not the lienor, would be entitled to the dividends thereon and which were worth as much as any other share of the same class, and in the interest of commerce and to enable him to get such stock, the law will impute a duty to the trust company to deliver shares of that description and not merely shares lawfully issued in proper form, with genuine signatures, regardless of whether they were worthless owing to a lien thereon or not. The authorities upon the subject of implied warranty as an exception to the rule of *caveat emptor* collated and discussed.

6. LIABILITY OF AGENT TO THIRD PERSON — UNDISCLOSED PRINCIPAL. The trust company cannot escape liability by claiming that it sold as agent, even if the party to whom it issued the certificate knew it was acting as agent for some one, but did not know for whom, since it did not disclose the name of its principal.

*McClure* v. *Central Trust Co.,* 28 App. Div. 433, reversed.

(Argued October 23, 1900; decided November 27, 1900.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered April 18, 1898, affirming a judgment in favor of defendant entered upon the report of a referee.

This action was brought to recover the sum of $7,500 paid by the plaintiff upon a certain contract, which he seeks to rescind upon several grounds, and among them that he was induced to make it through fraud and deceit practiced upon him by the defendants.

The defendant Warner served no answer, but the Central Trust Company put at issue every allegation tending to show fraud or deceit on its part, either through false representation or fraudulent concealment.

The H. H. Warner Company, Limited, is a foreign corporation, organized in England, with its principal office in the city of London. It has a capital of £550,000, divided into 20,000 shares of preferred and 35,000 shares of common stock, each share being of the par value of £10. In 1889 Mr. Warner, who had for a long time and with great success dealt in proprietary medicines at Rochester, N. Y., sold his business to the English corporation, and received as part of the purchase price a large number of the shares of stock issued. He also purchased many other shares in the open market, and in 1891 he was the largest shareholder as well as the managing director. He wished to sell a part of his stock in this country, but as the books of transfer were kept in London, so that shares could not be transferred thereon without considerable delay, he devised a method of so placing his shares upon the market that they could be conveniently dealt in on this side of the Atlantic. This method was to sell shares through certificates, issued by a trust company, representing the number of shares sold, and through which, in due time, the shares could be transferred upon the books of the English company. He arranged with the Central Trust Company of New York to act as agent for the transfer of certificates, and with the Union Trust Company to act as the registrar of certificates. He employed S. V. White & Company, a firm of brokers, to act as promoters of the scheme, and they issued a prospectus to induce purchases, with the knowledge of the Central Trust Company, which allowed copies to remain on its counters for distribution.

The prospectus was dated " New York, April 28, 1891,"

and stated that "Messrs. S. V. White & Co., bankers, 36 Wall street, New York, are authorized to offer for subscription" a certain number of shares of each kind of the stock in question, describing it as the stock of an English corporation, setting forth the amount of capital, its division into preferred and common stock, the number of shares of each and the par value of the shares. It then continued as follows: "The $500,000 preferred cumulative 8 per cent stock now offered in this market, consists of 10,000 full paid and non-assessable shares  *  *  *  represented by trust company certificates of the Central Trust Company of New York, against which certificates a like number of preferred shares  *  *  *  of the English company have been deposited. Dividends payable at Central Trust Company, New York.  *  *  *  The foregoing offering of 10,000 shares preferred stock, for which trust company certificates have been issued to comply with the requirements of this market, comprises all the stock held in this country for sale, with the exception of 5,000 shares of common stock.  *  *  *  Trust company certificates will also be issued for the common stock. Both classes of stock are offered on the following terms," which were at the rate of $48.50 per share for preferred and $75 per share for common, including "accrued dividend from February 1st, 1891." It announced that subscription lists would be opened on May 7th and closed May 9th, 1891, by S. V. White & Company, the Central Trust Company and the Bank of North America, "from whom prospectuses and blank forms of application can be obtained." Ten per cent of the subscription was payable on application; thirty per cent on allotment; thirty per cent on May 20th, and the remainder on June 1st, 1891.

The prospectus further stated that "receipts will be given for all payments made and engraved trust company certificates, issued by the Central Trust Company, will be delivered as soon as practicable after the making of the final payment.  *  *  *  Registrar of certificates, Union Trust Company, New York; transfer agents, Central Trust Company, New York; American committee of management, Hon. H. H.

Warner, president," with a vice-president, treasurer and secretary. The rest of the prospectus was devoted to the nature of the business, the property conveyed to the English company by Mr. Warner, the earnings, prospects, etc. The prospectus was not signed, but appended thereto was a letter from Warner dated April 23rd, 1891, addressed to S. V. White & Company, in which, purporting to answer their inquiry as to his opinion of the business of the English company, he said: " I have seen a copy of your proposed circular, in which you are about to offer for sale some of the preferred and common stock of said corporation." He then expressed his confidence in the business of the company and predicted great prosperity for it.

On the 21st of May, 1891, the plaintiff subscribed for 100 shares of the common stock, and upon paying the ten per cent down as required by the prospectus, received therefor from the Central Trust Company what is known as a temporary receipt, stating the amount paid and describing it as the first installment of ten per cent on his application for 100 shares of common stock. The paper also stated that "said application is made in accordance with the terms of the prospectus of April 28th, 1891," and, after reciting the terms of payment, allotment, etc., as stated in the prospectus, continued : " Upon payment of the last installment, which completes the subscription price of $75 per share, and the surrender of this receipt, the said William McClure shall receive a certificate of the Central Trust Co. of New York, representing the number of shares of the ordinary or common stock of H. H. Warner & Co., Limited, allotted and paid for under the said application, of the par value of £10 sterling per share as soon as the same is ready for delivery." When this receipt was given the shares of stock represented by it were on deposit with the trust company in readiness to fulfill the contract.

On the 23rd of June, 1891, the plaintiff completed his payments and received from the Central Trust Company two certificates, each of which, after stating that there had been deposited with said company " in trust " fifty shares of the

stock in question, continued : " Said shares, together with a deed of transfer thereof, will be delivered to William McClure or assigns on surrender of this trust receipt properly indorsed. This receipt is transferable at the office of said trust company in New York either in person or by power of attorney, and, until surrender, all dividends collected upon said shares by said trust company will be paid to the registered holder of this receipt or to his order." Each certificate had indorsed thereon the usual blank form of transfer.

On the 2nd of June, 1891, Mr. Warner gave the Central Trust Company an order on H. H. Warner & Company to pay it any dividends on 1,000 shares each of his ordinary and preferred stock standing in his name on the books of the company, and stated that " this order is irrevocable until changed by written consent of said Central Trust Company of New York."

On the 13th of November, 1891, the Central Trust Company paid to the plaintiff a dividend on the stock which he had purchased, and at the same time gave him a " memorandum of dividend for six months ending July 31st, 1891, on stock of H. H. Warner & Co., Limited (a corporation), in name of William McClure, ten per cent on one hundred shares * * * $485." A second dividend for six months ending January 31st, 1892, but less in amount, was paid to the plaintiff and a similar memorandum signed by the Central Trust Company delivered to him at the time.

The deed of transfer referred to in the stock certificate was in the form of an ordinary assignment of shares of stock from Hulbert Harrington Warner to the transferee, except that the closing part was as follows : " Subject to the several conditions on which I held the same immediately before the execution hereof, and the said transferee doth hereby agree to accept and take the said shares, subject to the conditions aforesaid." Accompanying the deed of transfer were the shares of stock therein mentioned, which were in the form of a certificate under the seal of the corporation, stating that the owner was " the registered holder " of a certain number of shares of stock, describing it, " in H. H. Warner & Company,

Limited, subject to the articles of association and regulations of the company, such shares being numbered * * * inclusive."

On the 29th of November, 1890, Mr. Warner was owing the English company over $400,000, and in order to secure the payment thereof he transferred to two of the directors as trustees for the company 4,000 preferred and 12,820 common shares of his stock as collateral security, and in the instrument of transfer he charged said shares with the payment of the debt and interest, and agreed that all dividends payable thereon, as well as those on any other shares registered in his name, should be applied upon his indebtedness. In case he did not pay the debt by the 1st of May, 1891, he authorized the company to sell " any of such shares upon such terms as they may think fit and apply the proceeds in reduction of the debt." The instrument closed as follows : " It is understood * * * that I shall be at liberty at any time to exchange any of the above-mentioned shares for other shares of the company of equal nominal value should I wish to do so, and that as the debt is reduced, a proportionate amount of shares shall be released and retransferred to me, or as I may direct, but so that the company shall at all times retain shares taken at this nominal or par value to double the amount of the debt and interest remaining owing."

The articles of association of the English company, as originally adopted, provided that " the directors may refuse to register the transfer of any share not fully paid up, if the transfer is made by a member who is indebted to the company or against whom the company has any unsatisfied claim or a lien on his shares, or if the directors shall not be satisfied that the proposed transferee is a responsible person." By another clause of the original articles it was provided that " the company shall have a first and paramount lien upon all the shares not fully paid up, registered in the name of any member (whether solely or jointly with others) for his debts, liabilities and engagements, solely or jointly with any other person, to or with the company, whether the period for the payment or discharge thereof shall have actually arrived or not, and such

lien shall extend to all dividends declared on such shares."
An independent article authorized the directors to retain all
dividends declared upon any share and apply them upon any
lien held by the company on any shares.

On the 26th of April, 1893, the articles of association were
amended by striking out the words "not fully paid up" in
each of the foregoing clauses.

The plaintiff did not know when he made his subscription
or accepted the certificate that the stock belonged to Mr.
Warner or stood in his name. The Central Trust Company
knew it, however, but did not know that there was any lien
or charge upon the stock until about 1894. It received
$1,200 a year from Warner for acting as transfer agent.

The shares of stock deposited with the Central Trust Com-
pany, before it issued any certificates, were sent by the English
company to their attorneys in New York, who delivered them
to S. V. White & Company, by whom they were delivered to
the Central Trust Company. Some of the money paid by
purchasers of certificates went back through the same hands
to the English company, but the subscriptions received in May
and June, 1891, were paid by the Central Trust Company to
Mr. Warner, individually. The plaintiff testified that the
statements set forth in the prospectus were believed and relied
upon by him, and that they induced him to make the invest-
ment. He had not seen the form of the deed of transfer or
of the certificate of stock in the English company when he
purchased, nor did he ask to see either. The Central Trust
Company did not state "as to whom they were acting as agents
for." The plaintiff has been a stockbroker since 1868, and
for some years was vice-chairman and chairman of the New
York Stock Exchange.

On the 8th of May, 1893, Mr. Warner made a general
assignment for the benefit of creditors, which covered a large
number of shares of both common and preferred stock stand-
ing in his name, and the assignee testified that neither kind
had any value, because Warner's interest had been incum-
bered by obligations created by him to the English company,

which, since 1892, has refused to pay dividends upon, or to transfer any stock registered in his name until their liens are discharged.

In January, 1894, the plaintiff presented his certificates to the Central Trust Company and demanded the shares of stock purchased by him, refusing to accept the deed of transfer from Mr. Warner, with a certificate of the requisite number of shares standing in his name attached thereto. Shortly afterwards he commenced this action, having first offered to return the dividends which he had received. At the close of the evidence for the plaintiff, the referee dismissed the complaint, holding that no cause of action had been established against the Central Trust Company either *ex delicto* or *ex contractu*. The judgment entered accordingly was affirmed by the Appellate Division without an opinion, and the plaintiff appealed to this court.

*Harry Van Ness Philip* for appellant. All representations made by defendant or with its knowledge and consent, whether made before or after the delivery of the trust certificates, should have been considered by the referee. (*Sommer* v. *Oppenheim*, 19 Misc. Rep. 605; *White* v. *Benjamin*, 150 N. Y. 258; *Smith* v. *N. B. Society*, 123 N. Y. 85.) The defendant is answerable to the plaintiff for all concealments of fact and false representations. (*Vail* v. *Reynolds*, 118 N. Y. 297; *Currier* v. *Poor*, 84 Hun, 45; *Goodman* v. *Laborn*, 11 App. Div. 617; *Crowe* v. *Lewin*, 95 N. Y. 423; *McKnight* v. *Devlin*, 52 N. Y. 399; *Hoe* v. *Sanborn*, 21 N. Y. 522; *Jarvis* v. *Bush Co.*, 25 N. Y. S. R. 3; *Haskins* v. *Pemberton*, 51 N. Y. 198; *Ledwich* v. *McKim*, 53 N. Y. 307; *Oberlander* v. *Speiss*, 45 N. Y. 178.) The Central Trust Company is liable to plaintiff as principal for its part in the transaction. (*Cobb* v. *Knapp*, 71 N. Y. 348; *Cunningham* v. *Wathen*, 14 App. Div. 553; *M. N. Bank* v. *Gallaudet*, 120 N. Y. 298; *Nichols* v. *Weil*, 30 Misc. Rep. 441.) The allegations of fraud and conspiracy in the complaint do not render it necessary that the plaintiff establish or stand upon a

cause of action *ex delicto.* (*Bixbie* v. *Wood*, 24 N. Y. 607; *Hubbell* v. *Meigs*, 50 N. Y. 487; *Ledwich* v. *McKim*, 53 N. Y. 307; *Freer* v. *Denton*, 61 N. Y. 492; *Woodbury* v. *Delos*, 65 Barb. 501; *Campbell* v. *Wright*, 21 How. Pr. 49; *Russell* v. *Brownell*, 20 Wkly. Dig. 504; *G. Ins. Co.* v. *Turner*, 61 Ga. 561; *Vreeland* v. *Stone*, 29 N. J. 188; *Peebler* v. *Guano Co.*, 77 N. C. 233.) It having been proved not only that the plaintiff offered and offers in this action to return what he received, but that he made the offer before bringing the action the cause of action, *ex delicto*, founded upon rescission has been established as well as the one in equity for a rescission. (*Rothschild* v. *Mack*, 115 N. Y. 1; *Daly* v. *Wise*, 132 N. Y. 312; *Babcock* v. *Eckler*, 24 N. Y. 623; *Bassett* v. *Judson*, 21 N. Y. 238; *Hoe* v. *Sanborn*, 21 N. Y. 552; *Dawson* v. *Christopher*, 15 N. Y. S. R. 934; *Bigley* v. *Atkins*, 7 N. Y. S. R. 235.)

*Adrian H. Joline* for respondents. The action was at law to recover money paid, based upon a rescission of the transaction on the ground of fraud, with an offer to restore what had been received. In order to recover the plaintiff was bound to show representation, falsity, scienter, deception and injury. (*Arthur* v. *Griswold*, 55 N. Y. 400; *Brackett* v. *Griswold*, 112 N. Y. 454.) In this form of action the plaintiff cannot recover as upon contract. (*Barnes* v. *Quigley*, 59 N. Y. 265; *Southwick* v. *F. Nat. Bank*, 84 N. Y. 420; *Mea* v. *Pierce*, 63 Hun, 400; *Patterson* v. *Patterson*, 1 Abb. [N. S.] 262; *Ransom* v. *White*, 39 Barb. 104; *Walter* v. *Bennett*, 16 N. Y. 250; *Sibley* v. *Hastings*, 21 Hun, 110; *Burnham* v. *Seligman*, 54 N. Y. 661; *Dudley* v. *Scranton*, 57 N. Y. 524; *Ross* v. *Mather*, 51 N. Y. 108.) The appellant has not sustained any injury by any act of respondents. He has an absolute right to his shares, and the refusal of the English company to permit a transfer of the shares is without justification. (*Driscoll* v. *W. B. & C. Co.*, 59 N. Y. 96; *Moore* v. *Met. Bank*, 55 N. Y. 43; *Benton* v. *Hatch*, 43 Hun, 142; *Donai* v. *M. E. R. R. Co.*, 14 N. Y. S. R. 264; *Hier*

v. *Grant*, 47 N. Y. 278; *Marsh* v. *Dodge*, 66 N. Y. 533; *Schwartz* v. *Oppold*, 74 N. Y. 307; *Van Alstyne* v. *Norton*, 1 Hun, 537; *Weston's Case*, L. R. [4 Ch.] 20; *Matter of K. Y. Club*, L. R. [21 Ir.] 199.)

Vann, J.   The Central Trust Company, henceforth called the defendant, did not sell the stock as its own, but only as agent for an undisclosed principal.  The prospectus did not purport to have been issued by it, but by S. V. White & Company, who, as bankers, announced that they were authorized to offer the stock for subscription, which, in view of what followed, meant for sale by subscription.  The necessary inference is that they were thus authorized, not by themselves, which would be absurd, but by an undisclosed owner.  This is confirmed by Warner's letter to them, which was part of the prospectus, wherein he said, "I have seen a copy of *your* proposed circular, in which *you* are about to offer for sale some of the preferred and common stock of said corporation."

According to the statements of the prospectus the shares of stock thus offered for sale could not have been shares not yet issued by the English company, as claimed by the plaintiff, for they are not only described as "full paid and non-assessable," but are declared to comprise "all stock held in this country *for sale*."

The prospectus contained no representation that the defendant was the transfer agent of stock, as is further claimed by the plaintiff, for there is no express statement as to what it was an agent to transfer, while the context shows that the agency was for the transfer of certificates, the same as the Union Trust Company was in terms and in the same connection, stated to be the "registrar of certificates."  Moreover, it was distinctly announced that trust company certificates had been issued by the defendant "to comply with the requirements of this market," and that the shares offered were represented by such certificates, against which a like number of shares had been deposited.  The certificates stated that they were transferable at the office of the defendant.  "The

requirements of this market " refer to the obvious impossibility of transferring, in this country, shares upon the books of a foreign corporation which are necessarily kept abroad. It was to meet this difficulty, as is fairly to be inferred from the language used, that the scheme of issuing certificates was devised, so that something which stood for shares and was capable of immediate transfer could be handled in this market with the facility belonging to dealings on the Stock Exchange, for the privileges of which, as the prospectus also stated, application would be made.

Thus the position of the defendant, according to the prospectus, was as follows: It was the depositary of certain shares of stock in the English corporation offered for sale by S. V. White & Company for an undisclosed owner, against which it was to issue certificates for the purpose of making the stock marketable in this country, and was to act as agent for the transfer of the same, as well as to receive applications for the sale of stock. This was all that the defendant represented to the plaintiff, for he asked no questions and it made no statements, except those which appeared in the various writings. When he first dealt with the defendant he knew all that it knew, except that Warner owned the stock, which was an immaterial fact, and the form of the deed of transfer and of the shares of stock as issued by the English company. Under these circumstances, on the 21st of May, 1891, he entered the office of the defendant and subscribed for 100 shares of stock, made the payment required in advance and accepted the temporary receipt, which became the first contract between the parties. By that instrument the defendant agreed that, upon payment of the last installment and the surrender of the receipt, the plaintiff should receive a certificate issued by it, representing the number of shares on deposit with it in trust, which he subscribed and paid for under the application. He made no inquiry either as to the form of the certificate or upon any other subject.

The next step was when he completed his payments on the 23rd of June, 1891, and the preliminary contract was per-

formed by the defendant through the delivery of the certificate as it had agreed. Thereafter the certificate was the only unperformed contract between the parties. The plaintiff still made no inquiry, but accepted the certificate as the completion of the contract without complaint or question.

Upon the delivery and acceptance of the certificate the transaction between the parties was complete, except that performance was still due from the defendant of its promise as contained in the certificate. If that promise was satisfied by the delivery or tender of the deed of transfer signed by Warner and attached to a certificate issued by the English company for the number of shares required, no breach thereof by the defendant has been shown. If, on the other hand, it was the duty of the defendant, under all the circumstances, to deliver an effective deed of transfer of marketable stock, free from lien, then the contract has not been performed. While the complaint may be multifarious, if the evidence established a cause of action of any kind, the motion to nonsuit should not have been granted.

We thus reach the question whether the defendant tendered to the plaintiff what it agreed to sell him. Disregarding the mere form of the transaction, the thing sold was stock, and did the stock tendered answer the description of the stock sold? Did the minds of the parties meet simply upon shares of stock that were marketable, or upon any shares of stock whether marketable or not? Did the defendant understand that shares of stock lawfully issued in proper form, with genuine signatures, was all that was required, regardless of whether they were worthless owing to a lien thereon or not?

In answer to these questions the defendant invokes the venerable rule of *caveat emptor*, and holds it up as a shield to protect it from liability to the plaintiff. That rule was rigidly enforced for many years, but as it was found at times to promote injustice, its severity was, to some extent, gradually but cautiously relaxed. Thus, if one sold as his own, goods belonging to a stranger, it was at first held that the purchaser had no remedy unless the seller affirmed that the goods were his.

16

(*Dale's Case*, Cro. Eliz. 44; *Chandelor* v. *Lopus*, Cro. Jac. 4; *Roswel* v. *Vaughan*, Cro. Jac. 196.)  In the course of time this harsh application of the rule was overturned upon the ground that the act of selling was an implied affirmation of title where the one selling was in possession of the thing sold. (*Crosse* v. *Gardner*, Carth. 90; *Medina* v. *Stoughton*, 1 Salk. 210; *Defreeze* v. *Trumper*, 1 Johns. 274.)  The doctrine of implied warranty thus made its first inroad upon the rule of *caveat emptor*, owing not to what the parties said, but to the nature of the transaction.  Since then further inroads have been made until the rule is now "regarded as upon the whole well adapted to protect right, to prevent wrong and to provide a remedy for a wrong where it has occurred." (1 Parsons on Contracts [8th ed.], 597.)  Thus, there is now, not only an implied warranty of title, but, under certain circumstances, of quality also, as where the sale is by sample, or the buyer has no adequate opportunity to examine before purchasing, as well as in some other instances. (*Carleton* v. *Lombard, Ayres & Co.*, 149 N. Y. 137; *White* v. *Miller*, 71 N. Y. 118; *Van Wyck* v. *Allen*, 69 N. Y. 61; *Leonard* v. *Fowler*, 44 N. Y. 289; *Kellogg Bridge Co.* v. *Hamilton*, 110 U. S. 108; *Hibbert* v. *Shee*, 1 Camp. N. P. 113.)

While the obligation of the vendor is described by some courts as arising from an implied warranty, by others from a duty imputed by law, and by others still as an implied condition of existence or identity of the thing sold, all mean that the law imputes a duty to the seller, under certain circumstances, whether he actually intended to assume it or not.  The modern tendency is to impute a duty whenever it is required by good faith in commercial dealings, *fides servanda est.* When, from the nature of the transaction or the relative situation or circumstances of the parties, a legal duty should reasonably be imputed to the seller of personal property, in the interest of commerce and to enable the purchaser to get what he paid for, the law will generally impute one, although progress in that direction has been slow and cautious in view of the ancient rule of *caveat emptor*.

The principle which governs sales of tangible chattels applies with equal force to sales of incorporeal chattels, such as a promissory note without indorsement, or a share of stock, where the thing actually sold is the right evidenced by a piece of paper with a particular name, though the form of sale is of the paper itself. An examination of the leading authorities relating to this branch of the subject may be useful.

In *Delaware Bank* v. *Jarvis* (20 N. Y. 226) the defendant had transferred to the plaintiff, without indorsement, a promissory note which had been taken at a usurious premium. The court held that whether the defendant had knowledge of the usury was not a material circumstance, and "that the vendor of a chose in action, in the absence of express stipulations, impliedly warrants its legal soundness and validity." Ten years later this case was followed and made the basis of judgment in *Fake* v. *Smith* (2 Abb. Ct. App. Dec. 76.)

*Webb* v. *Odell* (49 N. Y. 583) was a similar case, and the same result was reached, but upon a somewhat different ground. The court said : " It is a general rule that, upon the sale and delivery of personal property, without fraud or warranty, no action will lie against the vendor to recover damages for any defects which may exist, and this rule applies when the article differs from the representations of the seller as to quality, unless said representations were fraudulent. But when the thing sold differs in substance from what the purchaser was led by the vendor to believe he was buying and the difference in subject-matter is so substantial and essential in character as to amount to a failure of consideration, there is no contract, and the purchaser may recover back the money paid. (Kerr on Fraud & Mistake, 58 *et seq.*) "

In *Ledwich* v. *McKim* (53 N. Y. 307) some railroad bonds turned out to be worthless because they were not perfect when they passed from the possession of the defendants to that of the plaintiff's assignor for the want of an indorsement by the company as to where they were to be paid. It was held that there was an implied warranty of title in the assignor, and that upon failure of title he was liable. In the course of its

opinion the court said : " It is not to be disputed that if these papers are other than negotiable instruments there was in the sale of them by the defendants an implied warranty of their title to them, and upon a failure of title they are liable. The defendants insist, however, that they only impliedly warrant the genuineness of the execution of the instrument. In this they err. (*Murray* v. *Judah*, 6 Cow. 484.) The seller warrants the genuineness of the instrument and that it is what it purports to be. (*Gurney* v. *Womersley*, 28 Eng. L. & Eq. 256 ; *Thrall* v. *Newell*, 19 Vt. 202.)"

In *Ross* v. *Terry* (63 N. Y. 613) the rule of implied warranty on the part of the vendor was applied to the sale of a bond and mortgage, which were usurious and void, but the defendant knew it at the time of the sale.

There was no question of usury in *People's Bank* v. *Bogart* (81 N. Y. 101), where it was held that there was no implied warranty or representation on the part of the vendor of a bill, valid in the hands of an indorsee, that it was drawn against funds or that it was not accommodation paper, because accommodation acceptances " are certainly not unusual commercial transactions," and are not necessarily " inconsistent with good faith or solvency."

So in *Mandeville* v. *Newton* (119 N. Y. 10), where a party held certain notes and other indebtedness against the maker of the notes, and also held certain claims as collateral security therefor, but after making various collections on the collaterals sufficient to pay the notes, no application having been made in payment of any specific items of indebtedness, at the instance of the debtor and on payment of the balance due him, the holder assigned his claims and transferred the notes, with the collaterals, to another creditor, without any express warranty that the notes were valid outstanding obligations, it was held that no warranty could be implied because it was not in any proper sense a purchase of the notes, except in so far as they, with the other claims transferred at the same time, represented the balance which, after the application of what had been collected, would remain due on the claims transferred.

In *Littauer* v. *Goldman* (72 N. Y. 506) it was held that upon the transfer, without indorsement or representation, of a promissory note tainted with usury, in the absence of knowledge of the fact on the part of the seller at the time of the transfer, no warranty against the defect will be implied, because a scienter is essential to establish an implied warranty as to the validity of a promissory note. This authority, which apparently controlled the referee in deciding the case now before us, has not escaped criticism. Thus in *Meyer* v. *Richards* (163 U. S. 385, 411), after a thorough review of the leading authorities in this country and England, the court said : " There is an exceptional case, *Littauer* v. *Goldman* (72 N. Y. 506), which holds that the common-law obligation, as to the implied warranty of identity in the thing sold, in the case of commercial paper, extends only to the genuineness of the instrument. The case was one involving the nullity of a usurious note, and, if correctly decided, would be authority for the proposition that there was a peculiar species of warranty in the sale of commercial paper differing from all others ; in other words, that there was a law merchant of warranty where there was no commercial contract. The opinion in this case illustrates the same contradictory position presented here by the argument of the defendant in error, to which we have just called attention, that is, that it admits the common-law rule and then denies its essential result by eliminating conditions of non-existence which are necessarily embraced by it. It follows that this New York decision leads logically to the view expressed in the Maine and Maryland cases just referred to, for either the principle of warranty of identity must be accepted or rejected ; it cannot be accepted and its legitimate and inevitable results be denied. The rule there announced was in conflict with previous decisions in New York, and the decision is strongly criticised in the Court of Errors and Appeals of New Jersey, in *Wood* v. *Sheldon* (42 N. J. Law, 421, 425)."

In *Meyer* v. *Richards* it was held that in a sale of commercial paper without indorsement, the obligation of the ven-

dor is not restricted to the mere question of forgery *vel non*, but depends upon whether he has delivered that which he contracted to sell, this rule being designated in England as a condition of the principal contract, as to the essence and substance of the thing agreed to be sold, and in this country being generally termed an implied warranty of identity of the thing sold.

In view of the latest case in this court upon the subject of implied warranty, *Littauer* v. *Goldman* may properly be limited to commercial paper, as it is the policy of the law to throw special safeguards around the transfer of such property. Although cited in the case of *Flandrow* v. *Hammond* (148 N. Y. 129), it was not allowed to control the decision. In the *Flandrow* case, on the sale of a judgment by a party who had levied upon it and bought it on execution sale, in pursuance of an agreement to bid it off in satisfaction of the execution and transfer it to the other party, who advanced the money for the expenses of the proceedings, it was held that there was an implied warranty not only of the existence of a valid judgment, but that a valid lien had been acquired thereon by the levy, under which title could be acquired by sale upon execution. This case rests upon the principle that where one sells as his own an incorporeal chattel, a warranty will be implied whenever and to the extent required by good faith. (See, also, *Stone* v. *Frost*, 61 N. Y. 614; *Roberts* v. *Fisher*, 43 N. Y. 159; *McCoy* v. *Artcher*, 3 Barb. 323; *Dresser* v. *Ainsworth*, 9 Barb. 619; *Carman* v. *Trude*, 25 How. Pr. 440.)

The cases in other states, with few exceptions, hold that upon the sale of stock, bonds, etc., there is an implied warranty that the thing sold is what it purports to be. (*Wood* v. *Sheldon*, 42 N. J. Law, 421; *Thrall* v. *Newell*, 19 Vt. 208; *Allen* v. *Clark*, 49 Vt. 390; *Flynn* v. *Allen*, 57 Pa. St. 482; *Brown* v. *Ames*, 59 Minn. 476; *Ware* v. *McCormack*, 96 Ky. 139; *Bell* v. *Cafferty*, 21 Ind. 411; *Lyons* v. *Miller*, 6 Grat. 427; *Aldrich* v. *Jackson*, 5 R. I. 218; *Merriam* v. *Wolcott*, 85 Mass. 258; *Lobdell* v. *Baker*, 3 Metc. 472; *Giffert* v. *West*, 33 Wis. 617; 37 Wis. 115; *Daskam* v. *Ullman*, 74

Wis. 474; *Smith* v. *McNair*, 19 Kan. 330; *Rogers* v. *Walsh*, 12 Neb. 28; *Hussey* v. *Sibley*, 66 Me. 192; *Terry* v. *Bissell*, 26 Conn. 23.) The position of the English courts is fairly stated in Benjamin on Sales when he says: "Under this head may also properly be included the class of cases in which it has been held that the vendor who sells bills of exchange, notes, shares, certificates and other securities, is bound, not by the collateral contract of warranty, but by the principal contract itself, to deliver as a condition precedent that which is genuine, not that which is false, counterfeit or not marketable by the name or denomination used in describing it." (Benjamin on Sales [7th ed.], § 607; *Young* v. *Cole*, 3 Bing. N. C. 724; *Westropp* v. *Solomon*, 8 C. B. 345; *Gompertz* v. *Bartlett*, 23 L. J. [Q. B.] 65; *Gurney* v. *Womersley*, 24 L. J. [Q. B.] 46.)

Story, in his work on Promissory Notes (§ 118 *et seq.*), says that the seller of a note warrants by implication, unless otherwise agreed, that he is the lawful holder and has a just and valid title to the instrument and a right to transfer it by delivery; that the instrument is genuine, and not forged or fictitious; that it is of the kind and description it purports on its face to be, and that he has no knowledge of any facts which prove the instrument, if originally valid, to be worthless, either by failure of the maker or by its being already paid, or otherwise to have become void or defunct. He further says, however, that the authorities are in conflict when a fact exists which makes the note of no value, but both parties are equally ignorant and equally innocent. Under these circumstances, the learned author declares that the weight of reasoning and the weight of authority seem to be in favor of holding that the seller in such cases must bear the loss. (See, also, Schouler's Per. Prop. § 318; Daniel's Neg. Inst. § 730; Byles on Bills, 278; Biddle on Stockbrokers, 265; 2 Randolph Com. Paper, § 757.)

We think it was a condition of the sale, whether called an implied warranty or any other name, that the defendant was to deliver marketable stock free from lien, for that alone would meet the description of the thing sold, under the circumstances

surrounding the parties when the sale was made.    Shares of
stock, so covered with liens as to be of no value, are not what
the parties meant, for such shares would be worth no more
than if the signatures to the certificates had been forged,
although but for the liens the stock would have been worth
the sum paid for it.    The substance of the thing sold was not
stock of any particular market value, but unincumbered stock,
of the same value as free shares, such as persons of ordinary
intelligence would understand was meant by the general
description of stock.    By a share of stock the parties did not
mean half a share or any fraction of a share representing an
equity of redemption, but an entire share not cut down by a
charge.    They meant a share, the owner of which and not the
lienor would be entitled to the dividends thereon, and which
was worth as much as any other share of the same class.

The defendant cannot escape liability by claiming that it
sold as agent, for it did not disclose the name of its principal.
The same claim was made in *Holt* v. *Ross* (54 N. Y. 472, 474),
but the court said : " The express company, when it pre-
sented the draft to the plaintiffs for payment and received
payment, did not disclose its agency ; therefore, it is liable as
if an actual principal in the transaction.    It was so decided in
*Canal Bank* v. *Bank of Albany* (1 Hill, 287).    It was not
sufficient that the defendant acted as agent; to shield itself
from liability it should have disclosed its agency.    Such is the
rule as to all agents.    To shield themselves from liability for
their acts they must give the names of their principals."    This
is true even if the plaintiff knew that the defendant was act-
ing as agent for some one, but did not know for whom    (*Cobb*
v. *Knapp,* 71 N. Y. 348 ; *Argersinger* v. *Macnaughton,* 114
N. Y. 535 ; *Cabot Bank* v. *Morton,* 4 Gray, 156.)

The defendant was the central figure in a plan to make
shares issued by an English corporation readily marketable in
this country.    For that purpose it issued the certificates of
transfer and accepted the position of agent to transfer certifi-
cates in consideration of an annual salary.    It held out the
shares in its possession for sale as marketable.    The acts of

certifying, offering for sale and selling were in substance an assertion to that effect. Its position was one of trust and invited the confidence of the public. What a trust company sells even for a third person, under such circumstances, the purchaser may reasonably expect to receive in essence and substance, and not its mere shadow. It held the shares and the deeds of transfer in trust for purchasers, and expressly agreed to make delivery upon demand. It was to deliver something which it knew purchasers would expect, and which of necessity it must itself have expected, would result in the transfer of marketable shares. The position which it occupied and the circumstances surrounding it when it contracted with the plaintiff cast upon it the duty of exercising due care in discharging the trust relation which it had assumed. It knew, but the plaintiff did not know, that the shares in its possession were issued by the English company subject in express terms to its articles of association and regulations; that the deed of transfer was likewise "subject to the several conditions on which" the transferrer held the shares "immediately before the execution" thereof, and that it also contained a covenant on the part of the transferee "to accept and take the said shares subject to the conditions aforesaid." Under these circumstances the law imputed to the defendant the duty of inquiring to see whether there was anything behind the conditions appearing on the face of the papers in its possession, which would make the shares unmarketable, before it undertook to place them on the market under the sanction of its name and the confidence invited by its standing. Its position and superior knowledge put it upon inquiry and the law charges it with knowing whatever proper inquiry at the proper place would have disclosed. Inquiry at the office of the English company, in person or by letter, would have disclosed the lien and prevented the defendant from being imposed upon itself, and from unintentionally imposing upon others.

Whether the lien has been waived by the English company, or discharged according to the terms of the instrument which created it, were matters of defense which were not entered

upon by the defendant because a nonsuit was granted. While some facts bearing upon these questions were brought out upon cross-examination, the referee did not pass upon them, because in the view he took of the case it was unnecessary, as he was of the opinion that the defendant was not under the legal duty of delivering shares free from liens. We have taken the opposite view, which renders a new trial necessary, when the facts can be fully developed and any alleged defense intelligently passed upon. We discharge our present duty by reversing the judgments below and ordering a new trial, with costs to abide the event.

Gray, J. (dissenting). I dissent, and for these reasons, briefly. Assuming that the plaintiff can recover as for a breach of contract, notwithstanding that his complaint is based solely upon fraud and deceit, I think that he failed to make out any case against the respondent, the trust company. The latter did not sell the stock, either as its own, or as agent for an undisclosed principal. It was not in any strict sense Warner's agent. It was merely an agency selected by him for the safe deposit and custody of the English stock and of the moneys, and for the convenient transferring of the interests of those who might deal in the stock. It made no representations as to the value or character of the stock. Its undertaking was contained in the "trust receipts" which it issued, and that was to act as the agent for their transfer and, upon their surrender, to deliver the shares theretofore deposited with it, to the amount called for by the trust receipts, with the deeds of transfer thereof. Whatever material representations were made concerning the stock were contained in the prospectus issued by S. V. White & Co. It behooved the plaintiff, if he desired to satisfy himself further upon the subject of the shares as issued by the English corporation, to make proper inquiries. He knew he was buying the stock of a foreign corporation and that he was to receive it under a deed of transfer which accompanied the deposit of the stock. In such a case, prudence would seem to dictate the duty of

inquiry concerning the terms of the deed of transfer, if not, perhaps also, concerning the by-laws or regulations of the foreign corporation. He could not saddle the trust company with an unexpected and unusual liability by mere assumptions concerning the shares deposited with it. It was not bound to volunteer information and the plaintiff was no novice in such matters. He knew that the shares offered for sale had been issued by the English company; that the trust company was not placing them upon the market; that the trust receipts expressed the obligations of the trust company toward him and that the functions assumed by it were to hold certain shares of stock delivered to it, until the surrender in exchange therefor of the trust receipts; acting meanwhile as an agent for the convenient transfer of the receipts. Nor could the trust company be made responsible for the acts of the directors, or managing agents, of the English corporation in attempting to reserve, or provide for, a lien upon the fully paid up shares of stock at a time subsequent to their delivery to the trust company. If conceivable that that was permissible under English laws, it was at most a secret arrangement with the stockholder and it could have no retroactive effect. But, as it was, why, or how, is the trust company to be held responsible? As before remarked, it made no representations about the stock; it sustained no contractual relation with the English company and it was not called upon to do anything. It was powerless to change the situation and whatever remedy the plaintiff had was against White & Co., or their principal, Warner; if not against the English company. I think the trust company met its obligation to the plaintiff and that if he has sustained any legal damage at all, it is due to his own failure to inform himself concerning his proposed investment and not to any act of omission by the trust company.

I not only doubt the soundness of the doctrine, upon which it is sought to impute to the trust company a liability akin to that which it would be under as a vendor; but I doubt its wisdom. The trust company is one of a number of like insti-

tutions, which afford the community safe and convenient agencies in financial transactions of magnitude, where responsibility for the safety of values confided to them, as well as a complete and effective machinery, are demanded. It is sought to impute to this trust company duties and liabilities which its conduct did not suggest and which were not within the strict terms of its undertaking.

I think that the judgment should be affirmed.

PARKER, Ch. J., BARTLETT, MARTIN, CULLEN and WERNER, JJ., concur with VANN, J., for reversal; GRAY, J., dissents.

Judgment reversed, etc.