## LIABILITY OF BROKER TO SELLER OF SECURITIES.

Superior Court of Cincinnati.

JAMES E. SULLIVAN V. ARTHUR FRANK AND JESSE O. FRANK.

Decided, December 2, 1912.

*Sales of Securities—Broker Liable to Seller Upon Default of Undisclosed Purchaser—Measure of Damages Growing Out of the Default.*

1. A broker, who buys shares of stock for an undisclosed third person, becomes personally liable to the seller upon default of his principal.
2. Such broker is not relieved from such liability by making it known that he is buying for a third person, unless he names his principal or discloses his identity so that the seller knows to whom he is selling.
3. In such case, upon default of the principal, the seller may rescind the contract, retain the stock, and recover from the broker the difference between the contract price and the market price at the time of the default.

*Gilbert Bettman,* for plaintiff.
*Cohen, Mack & Hurtig,* contra.

PUGH, J.

On motion for instructed verdict.

The plaintiff, James E. Sullivan, prior to April, 1912, was owner of twelve shares of the capital stock of the Second National Bank, and had authorized Thomas O. Dunlap, a stock broker, to sell them for such price as he could get.

The defendants, Andrew and Jesse O. Frank, were stock brokers and partners under the firm name of A. & J. Frank, and in all the matters of the purchase of the shares of stock hereinafter mentioned, the firm was represented by the defendant, Jesse O. Frank.

On April 9th, Dunlap, the plaintiff's broker, called up the defendants by telephone, and, on being answered by Jesse O. Frank, offered to sell the twelve shares of Second National Bank stock at $140—which offer was declined.

On the following day, April 10th, Dunlap again called up the defendants and renewed the offer. It was again declined, but Dunlap was informed by Jesse O. Frank that he had a "party" who was "interested" in the stock at $135 per share. After some conversation, Dunlap proposed to split the difference and sell at $137.50 per share. The defendant, Jesse O. Frank, replied that he would have to consult "his party," and Dunlap held the line while Frank called up his principal. In a few minutes, Frank reported to Dunlap and said "My party will take it," and this closed the transaction.

Dunlap testified that Jesse O. Frank, at no time during the conversation, mentioned any third person as interested in the matter, or pretended to be acting for any one other than himself. But, for the purpose of passing on the motion now before the court, the account of the deal as testified to by Jesse O. Frank at the trial will be accepted as the true and correct one. His version is the one first above stated.

It is admitted that Dunlap was authorized by Sullivan to sell the stock at $137.50, and that A. & J. Frank were authorized by their principal to buy at that price.

The twelve shares of stock were specific and identified properly. Sullivan owned no other. The price was definitely agreed upon, and, in the absence of stipulation to the contrary, it was a cash sale—cash on delivery. By custom, which is also admitted, delivery and payment in such cases are to be made next day. The shares were represented by a certificate, then in possession of the seller, and nothing remained to be done by him except to endorse and deliver it to the buyer.

The transaction, on April 10th, was therefore a complete sale. The right of property in the shares passed from seller to buyer, and the former retained only a right of possession, or lien, until payment.

Next day, April 11th, the undisclosed principal was revealed as Mr. Galbreath, President of the Second National Bank. The two brokers, Dunlap and Frank went together to the Second National Bank to meet Galbreath and close the deal. Dunlap had with him the certificate for the shares, properly endorsed,

but before tendering the same was informed first by Frank, and then by Galbreath in person, that the latter refused to accept the shares and pay for them. Tender was thereby waived.

These are the main facts—the ones on which the case turns.

It is apparent that Dunlap, the plaintiff's broker, did not believe, at that time, that the defendants had incurred any liability to Sullivan, his principal, because of Galbreath's default. It is probable that the defendants themselves did not intend, at any time, to assume any personal responsibility in the matter, although Jesse O. Frank offered to pay Dunlap's commission if the latter thought that he, Frank, was to blame. But this in no way affects the questions of law arising upon the facts above stated, namely:

Is a broker, who has purchased shares of capital stock for an undisclosed principal, personally liable to the seller when his principal refuses to accept and pay for such shares?

If so, is such broker's liability in any way affected by the fact that, at the time of the purchase, he stated that he was buying for a third person, but did not give the name or reveal the identity of his principal?

The answers to these questions, as shown by the great weight of authority, are that the broker, acting for an undisclosed principal, is personally liable to the seller for the default of his principal, and that he is not relieved from such personal liability by stating that he is acting for a third person. Unless such broker reveal the name of his principal or in same way fix his identity so that the seller may know with whom he is dealing, he will be liable himself as principal. Strictly speaking such obligation is not contractual. It is in no wise dependent on the intention of parties, but is imposed on the broker—or any other agent, under like circumstances—by the law itself. *Wheeler* v. *Miller,* 2 Handy, 149; *Soutter* v. *Stoeckle,* 6 W. L. Bull., 182; *Mechens on Agency,* Sections 956, 957; *Story on Agency,* Section 267 (9th Ed.); *Mills* v. *Hunt,* 17 Wend., 333; *McClure* v. *Trust Co.,* 165 N. Y., 108.

In such cases, a broker can relieve himself from personal liability by an express stipulation to that effect, but, in this case, there was no such stipulation.

A seller, in event that a buyer refuses to accept and pay for shares of stock sold, may rescind the contract, retain the shares and sue the buyer for the difference between the contract price and the market price on the day of delivery. *Cullen* v. *Bimm*, 37 Ohio St., 236.

The seller's measure of damages against the agent of an undisclosed buyer would be the same. In this case, the plaintiff has elected to pursue this remedy and accept this measure of damages.

The contract price for the twelve shares of stock was $1,650. At the time of delivery, there was no market for the stock, nor could the same be sold at all. The entire amount of the contract price may, therefore, he recovered in this action.

At the close of the testimony, the plaintiff moved the court to direct the jury to return a verdict for the plaintiff in the sum of $1,650. For the reasons just stated, the court has no discretion in the matter and must grant the motion.

The jury, therefore, will be instructed as requested.