Harold Baer, J.
This is an action for breach of warranty in the sale of shares of stock in a realty development corporation. The case was tried before the court without a jury and formal findings of fact and conclusions of law were waived.
Defendants owned a large tract of land in Scarsdale, New York. They developed this land with roads and utilities. Houses were custom-built on order upon the first four sections and then the remaining four sections, which were not built upon, were sold to the plaintiff Most. Actually, plaintiff Most purchased three shares of stock in the corporation that owned these assets from the three defendants. He paid a consideration of $345,147.79 for these shares of stock in Huntley Estates of *241 Greenburgh, No. 3 Corp., which was the title owner of the land, improvements, sample houses, and other assets that made the transaction a purchase of “ a going business ”. There are only a few pertinent clauses in the contract of sale made on March 22, 1954 for the purpose of this lawsuit. The defendants represented in that contract and by separate affidavits of the three defendants as follows:
On page 3, by paragraph 1 (g): “ (g) That said corporation has duly paid any and all real estate taxes, water charges and water taxes, and Westchester County sewer system taxes levied, assessed or imposed upon it up to and including the period ending as follows: Town Tax through 12/31/53; School Tax through 6/30/54.”
On page 5, by paragraph 2: “ 2. The Sellers, jointly and severally, hereby guarantee payment of and will save the Purchaser, his personal representatives and assigns and each of them, free and harmless of and from all demands, claims, actions or causes of action, assessments, losses, damages and attorneys ’ fees by or by reason of any claims, obligations, debts, demands or liabilities existing against the corporation prior to and including the date of closing or arising or growing out of this purchase agreement, including but not limited to any and all federal income tax, franchise tax, capital stock tax, if any, whether then due or payable or subsequently determined or assessed, and of and from any assessments which may hereafter be made by the federal, state and local governments from the inception of the corporation to and including the date of the closing.”
On page 8, by paragraph 3: “ The purchase price set forth above shall be increased by apportioned prepaid real estate taxes and water rates, if any, computed as of the date of closing, and shall be diminished by the following, also computed as of the date of closing; unpaid real estate taxes and water rates, if any, sewer taxes, charges or assessment, if any, even though the same or any of them are or may become payable in annual installments, including those which are to become due and payable after the closing hereunder; a sum equal to the franchise taxes payable upon the dissolution of the corporation.”
On page 14, by paragraph 8: “ (g) That if the premises or any part thereof shall be or shall have been affected by assessment or assessments which are or may become payable in annual installments, of which the first installment is then a charge of lien or has not been paid, then for the purposes of this contract all the unpaid installments of any such assessment, including those which are to be due and payable after the closing here *242 under, shall be the obligation of the Sellers and the purchase price of the capital stock shall be diminished by the amount thereof and shall be deducted from the cash payment to the extent available and the balance, if any, from the demand note.”
On page 1 of the Addendum: “ (c) That there are no unpaid assessments in any form or fashion, whatsoever against the aforesaid premises, regardless of whether such assessments are or may become payable in annual installments, including those which become due and payable after the closing hereunder.”
On page 3 of the Addendum: “ (k) That so far as Sellers know, there is no reason why Sections E, E, Gr and H cannot be developed in the same manner as Sections A, B, O and D: and that so far as Sellers know, there is no action threatened or contemplated by any authority, federal, state or local, which would prevent such development.”
The purchaser Most, though designated as the principal in the contract, was in fact representing others, and this likewise is borne out not only by the testimony but the contract: “ 2. * * * In the event that any matter, thing, state of facts or claim of the kind and nature referred to in the first paragraph hereof [representations and warranties] is presented to the Purchaser, his personal representatives and assigns or to the corporation, its successors and assigns ”,
On page 9 of the Addendum:
“ 6. All warranties and representations contained herein and in the principal contract between the parties shall be deemed to be continuing warranties and representations and shah survive the closing hereunder. ” * * *
“ 9. The Purchaser shall have the right to assign and transfer this agreement, together with the right to the sum of $25,000.00 paid on the execution hereof, and upon the execution of such assignment and the assumption by such assignee of all the Purchaser’s obligations hereunder, a copy of which assignment and assumption shall be furnished to the Sellers, Amicus Most shall be relieved and discharged of any and all liability and obligation hereunder to the same effect and extent as if such assignee had originally been named as the Purchaser hereunder. ’ ’
After the sale of stock was consummated on May 24, 1954, plaintiff Most dissolved the Huntley Estates Corporation and he, with the principals for whom he was acting as agent, formed several corporations for the construction and sale of one-family houses. All of the corporations thus formed and all of the individuals interested therein, assigned their rights in the original contract and in this cause of action against the defend *243 ants, to the four plaintiffs herein. In August, 1954, less than three months after the closing of the transaction, plaintiffs were apprised of the fact that sewer installations had not been paid for by the defendants as represented. The North Ardsley Sewer District assessed each of the lots involved $805, or a total assessment for the 203 lots of $163,415. The plaintiffs also ascertained that three of the lots purchased could not be built upon, as defendants previously had agreed to dedicate them to the town for public park purposes. This suit was commenced. The plaintiff is seeking damages for breach of warranty with respect to the afore-mentioned three lots and the sewer assessments.
The parties agree that shares of stock are subject to article 5 of the Personal Property Law (Agar v. Orda, 144 Misc. 149, affd. 239 App. Div. 827, affd. 264 N. Y. 248; Bishop v. Tracy & Co., 237 App. Div. 496; McClure v. Central Trust Co., 165 N. Y. 108, 123).
Defendants deny liability on many grounds. However, evidence of the misrepresentation and breach of contract is clear with respect to the sewer assessment and the three lots. There is no doubt that plaintiffs’ assignors purchased the defendants’ stock and the assets such stock certificates represented, with the clear understanding that sewers had been installed and fully paid for; that there were and would be no assessments therefor; that defendants would hold the purchasers free and harmless from any liability for sewer assessments. Equally clear is the representation (that they could be built upon) with respect to the three lots involved. The fact is that defendants had not paid for the sewer installation; the property was assessed $163,415 for this installation, to be paid over a period of years, and the purchasers were unable to obtain building permits on the three lots. The court is satisfied from the evidence that defendants knew of these circumstances and restrictions when they made their representations and sold to the plaintiffs. They wantonly disregarded the consequences of their misrepresentations.
During the course of the trial the defendants raised several defenses that merit discussion and disposition. Pleadings notwithstanding, this is not a fraud action, but by stipulation plaintiffs agreed to proceed on contract and breach of warranty in connection with such contract. Defendants contend that there is no privity between the plaintiffs in this suit and the defendants and that, therefore, they may not recover on contract. They also contend that plaintiffs have proved no damages or, at best, speculative damages.
*244 With respect to the first contention, the court finds that there is privity of contract between the plaintiffs and the defendants. Clearly, the plaintiff Most was acting as an agent for a syndicate as well as for himself as a member of such group when he closed the contract. This contract clearly indicates that the defendants knew that he was acting as an agent. Further, the representations made by the defendants in this contract survive the contract and are made to plaintiff Most as well as assigns or corporations to be formed by him and his principals. The stock purchased by the plaintiff Most represented the assets of the defendants and their corporation. Most was purchasing for himself and others, and these others included corporations to be formed. All of the parties including the newly formed corporations assigned their rights and cause of action to these plaintiffs. There is clear privity between plaintiffs and defendants (Mygatt v. Coe, 124 N. Y. 212, 219 et seq.; 72 C. J. S., Privity, p. 955 et seq.).
The question of damages may not be so clear. Nevertheless, it would be most inequitable to permit these defendants, who clearly misrepresented and breached their contract, to profit by any technical difficulties that arise in arriving at a fair measure of damages. The difficulty arises from the fact that plaintiffs did construct houses on all the lots except three, and sold these houses at a price similar to the price obtained before the assessment of sewer charges against the property; that the purchasers in most cases assumed and paid the sewer assessment. The plaintiffs’ assignors only paid assessments on some of the property before it was sold, totalling (by agreement between the parties) $14,275.23. They also refunded $1,000 to two purchasers, and had some other miscellaneous expenses occasioned by the misrepresentation. However, the testimony of the representative from the Veterans’ Administration is that the Administration deducted $500 from the appraisal value of each building lot upon ascertaining that there would be an assessment for sewer installation. The defendants had previously represented to the Administration that they had paid for sewer installation and were requested to reimburse the purchasers of houses who obtained Federal mortgages, $500 each. It was also the testimony of this witness that real estate had enhanced in value' so that a house appraised for $20,000 in 1953 would have been appraised and approved for sale at $20,500 in 1954, when the plaintiffs were selling, but because of the sewer assessment the Veterans’ Administration had reduced the appraisal back down to $20,000. Sales to veterans with Federal mortgages would not be approved at a higher figure. "While it *245 may be true, as defendants contend, that plaintiffs could have sold in the open market with conventional financing at the higher figure, thus having purchasers absorb the sewer installation cost, and, while it is also true that there is no exact proof of how much of a loss plaintiffs suffered because of the sewer assessment, over and above the $15,000 afore-mentioned, defendants should not be permitted to profit by their wrongdoing.
The plaintiffs claim damages under subdivision 7 of section 150 of the Personal Property Law: “In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty.”
Obviously, if plaintiffs are entitled to relief under this section of the Personal Property Law, they would be entitled to $163,415 or more. There is no case substantiating this method of arriving at damages for the breach of warranty with respect to stock certificates. It is difficult to conceive of damages for breach of warranty of “ quality ” in the sale of such “ goods ”. Warranty of quality must be construed to mean their state or condition (Personal Property Law, § 156). There is nothing wrong with the quality, condition or merchantability of the stock certificates or, for that matter, the assets they represent. Bather, the breach complained of is with respect to the warranty of title and the warranty against encumbrances. It could be urged that this is a breach of the covenant in the contract against encumbrances. As such, it could he urged that the breach of such covenant by a grantor of land gives rise to damages in the amount of the encumbrance, though not discharged. Such measure of damages also would entitle these plaintiffs to $163,415 (5 Williston, Contracts [Bev. ed.], §§ 1408, 1409; Hof, Inc. v. Noll, 273 App. Div. 361, 365, affd. 299 N. Y. 588; Cady v. Allen, 22 Barb. 388, affd. 18 N. Y. 573). However, each case must be considered on its own facts. It would be just as unfair to grant damages far in excess of what plaintiffs suffered as it would be to deny recovery to the plaintiff on technical grounds. The plaintiffs ’ damages should be measured pursuant to subdivision 6 of section 150 of the Personal Property Law: “ The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty ”.
Plaintiffs are entitled to the damages proximately flowing from the breach of warranty.
*246 In American Jurisprudence (Vol. 15, Damages, § 51, pp. 440, 450), in discussing damages generally that may flow from a breach of contract, it is stated: “ [They] are the direct, natural, and proximate result of the breach or which in the ordinary course of events, would likely result from a breach and can reasonably be said to have been foreseen, contemplated, or expected by the parties at the time when they made the contract as a probable or natural result of a breach, including gains prevented as well as losses * * * they shall be the reasonably certain and definite consequences of the breach, as distinguished from mere quantitative uncertainty. * * * The rule that damages which are uncertain and too remote cannot be recovered only applies to such damages as are not the certain result of the breach, and not to such as are the certain result, but uncertain in amount.”
In Williston on Contracts (Vol. 5, § 1391, p. 3884) it is stated: ‘ ‘ the buyer’s damages for breach of warranty are not lessened because he has resold the goods at an enhanced price. Had the goods been as 'warranted, they might have resold at a still higher price. ’ ’
This statement is applicable to the $500 loss of profit sustained by these plaintiffs on each of the 200 lots that they sold. Plaintiffs did not prove that they sold all the lots and houses thereon to veterans, or the exact amount of their loss. Nevertheless, because damages are difficult to ascertain with exactness, does not preclude recovery. As was stated by Chief Judge Lewis of the Court of Appeals in Duane Jones Co. v. Burke (306 N. Y. 172,192): “ ‘ There is no good reason for requiring any higher degree of certainty in respect of the amount of damages than in respect to any other branch of a cause. Juries are allowed to act upon probable and inferential as well as direct and positive proof. And when from the nature of the case the amount of the damages cannot be estimated with certainty, or only a part of them can be so estimated, no objection is perceived to placing before the jury all the facts and circumstances of the case having any tendency to show damages or their probable amount, so as to enable them to make the most intelligible and accurate estimate which the nature of the case will permit.’ (1 Sutherland on Damages [4th ed., 1916], § 70.)”
In Wakeman v. Wheeler & Wilson Mfg. Co. (101 N. Y. 205, 212) the court stated: “ ‘ It is sometimes said that the profits that would have been derived from performance cannot be recovered; but this is only true of such as are contingent upon some other operation. Profits which would certainly have been realized but for the defendant’s default are recoverable. *247 * * * It is not an uncertainty as to the value of the benefit or gain to be derived from performance, but an uncertainty or contingency whether such gain or benefit would be derived at all. * * * It is sometimes said that speculative damages cannot be recovered because the amount is uncertain; but such remarks will generally be found applicable to such, damages as it is uncertain whether sustained at all from the breach. Sometimes the claim is rejected as being too remote. This is another mode of saying that it is uncertain whether such damages resulted necessarily and immediately from the breach complained of. The general rule is that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain. The latter description embraces, as I think, such only as are not the certain result of the breach, and does not embrace such as are the certain result, but uncertain in amount;’.”
In the case of Architector Co. v. Slomon (192 Misc. 319, 324), the court stated: 1 ‘ The fact that in the very nature of things plaintiffs could not and of course did not demonstrate with absolute certainty and mathematical accuracy what would have happened if the adhesive had been as warranted does not justify depriving it of damages. In such cases reasonable conjectures and probable estimates must be resorted to and the trier of the facts (in this case myself) must make the best approximation possible through the exercise of good sense and judgment (Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 209-210; MacGregor v. Watts, 254 App. Div. 904; Acunto v. Schmidt-Dauber Co., Inc., 207 App. Div. 411; Nathan v. King Features Syndicate Inc., 32 N. Y. S. 2d 519, affd. 265 App. Div. 843).”
Plaintiffs sold 200 building lots with houses constructed thereon. In some instances, they had to absorb and were unable to pass on the cost of the sewer assessment. In most sales, purchaser paid most, if not all, of the assessment as it was payable over a period of years. The assessment for each building lot was $805. This was not a direct loss to the plaintiffs, but the reduction in appraisal by the Veterans’ Administration was clearly a reduction of $500 for each sale to a veteran who wanted Federal financing.
It is only fair to assume that competition in the market required the pricing of all houses on the same basis as prices to veterans. Thus plaintiffs suffered a loss of a $500 profit on each sale. The court may and must make reasonable conjectures from the facts. Damages need not be proved with absolute certainty and mathematical accuracy. Gains prevented as well as losses sustained are recoverable by these plaintiff® (i^rM *248 tector Co. v. Slomon, supra; Sheldon v. Metro-Goldwyn Corp., 106 F. 2d 45, affd. 309 U. S. 390; Aladdin Mfg. Co. v. Mantle Lamp Co. of America, 116 F. 2d 708; Acunto v. Schmidt-Dauber Co., 207 App. Div. 411; MacGregor v. Watts, 254 App. Div. 904; Wakeman v. Wheeler & Wilson Mfg. Co., supra; 5 Williston, Contracts [Rev. ed.], §§ 1346, 1408, 1409).
The three lots upon which plaintiffs were prevented from building were a complete loss to them. They are entitled to recover the full consideration of $1,700 for each lot (Personal Property Law, § 150, subd. 6). However, during the trial plaintiffs agreed to execute and deliver quitclaim deeds for these three lots to the defendants. This does not make their cause of action one in rescission. They have asked for damages and they are entitled to damages of the full consideration that they paid for these three lots. However, they agreed to execute quitclaim deeds so that there could be no claim of unjust enrichment by the defendants, and this they should and will do.
Plaintiffs are entitled to judgment for $5,100 with respect to the three lots; $14,275.23 actually paid to the Town of Ardsley on account of sewer assessments; and with respect to the remaining 200 lots, they are entitled to damages in the sum of $100,000. Plaintiffs are granted judgment, therefore, in the sum of $119,275.23, with interest from November 26, 1956. This is the judgment of the court, and all motions are disposed of accordingly. Ten days ’ stay, 60 days to make a case.