SALTER v. WILLIAMS et al.

(Circuit Court of Appeals, Third Circuit. August 13, 1917.)

No. 2207

1. BANKS AND BANKING ☞262—LIABILITY OF BANK—REPRESENTATIONS OF PRESIDENT.

Regarding liability of a bank for fraudulent representations of its president in sale to plaintiff of stock of the bank owned by Y., requiring restoration of plaintiff to his prior situation, the president was acting for it, and not for Y., his acts, with the approval of its governing board, being for the purpose of complying with the direction given it by the comptroller of the currency to reduce Y.'s indebtedness to it, and Y., when approached, stating that, if the bank would advance money to. redeem such stock which he had pledged, and would sell it and apply the proceeds on his indebtedness to it, he would sell other securities and reduce his indebtedness with the proceeds; and this though after such sale was made Y. failed to keep his agreement as to further sales and reduction of his debt.

2. BANKS AND BANKING ☞243—NATIONAL BANK—RESCISSION OF STOCK PURCHASE—INSOLVENCY—DOUBLE LIABILITY.

Double liability under Rev. St. § 5151, of a holder of full-paid stock in a national bank, does not prevent the stockholder, after insolvency of the bank and appointment of a receiver, rescinding his purchase thereof for fraudulent representations of the bank's president acting for it in the sale of the stock; the stockholder paying his assessment under such statute, and disclaiming intention to sue for its recovery.

3. BANKS AND BANKING ☞242—NATIONAL BANK—RESCISSION OF STOCK PURCHASE—INSOLVENCY—SUBSCRIBER TO STOCK.

A purchaser of fully paid stock of a national bank is not a subscriber to its stock, liable for an uncompleted contract of subscription, as regards his right to rescind, after insolvency of the bank, the purchase, for fraudulent representations of its president, acting for it, though it loaned him part of the money for the purchase, and he is still indebted to it therefor.

4. BANKS AND BANKING ☞243—NATIONAL BANKS—RESCISSION OF STOCK PURCHASE—INSOLVENCY—PRIORITY OF CLAIMS.

No liability to creditors of a national bank preventing, a purchaser of stock therein may, after appointment of a receiver for it, rescind his purchase for prior fraud of the bank, with right to redress out of the funds in the receiver's hands like that of an ordinary creditor whose claim was contracted before the receivership.

Appeal from the District Court of the United States for the District of New Jersey; Thos. G. Haight, Judge.

Suit by William D. Salter against Christopher L. Williams, receiver, and another. From an adverse decree, plaintiff appeals. Reversed.

See, also, 219 Fed. 1017.

A. A. Melniker, of Jersey City, N. J., for appellant.

Barber, Watson & Gibboney, of New York City (Stuart G. Gibboney and George M. Burditt, both of New York City, of counsel), for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. This is an appeal from a decree dismissing a bill in equity filed by William D. Salter against the First National Bank of Bayonne and its receiver. Salter seeks by his bill to enjoin an action at law brought by the receiver against him on a note, to compel the cancellation of the note and the nullification of the transaction in which the note was given, on the ground of fraud by the bank, and to obtain the restoration of all parties to the positions in which they were before the transaction was entered into.

The facts of the case are not in dispute. The First National Bank of Bayonne was organized in 1908 with stock fully subscribed and paid. In 1913 George W. Young was indebted to the bank in the sum of $12,000. The Comptroller of the Currency directed the bank to reduce the loan. The bank, through its president, called upon Young for a payment. Young had no money with which to meet the call, but represented that he had 30 shares of the bank's stock, and proposed that the bank sell them and apply the proceeds to the reduction of his indebtedness. This appealed to the president as a practicable way of complying with the Comptroller's order, so he set about to sell the shares. He approached Salter, offered them at $200 (par $100), made representations as to the bank's solvency and the amount of its resources, which were false, and induced Salter's serious consideration of the purchase. Pending negotiation with Salter it developed that Young had previously hypothecated the shares with the Commercial Trust Company, and did not have them to deliver. Young then proposed that, if the bank would advance to the trust company the sum of $5,700 (the amount demanded for the release of the shares), and then sell them for $6,000 (thereby swelling Young's indebtedness to the bank from $12,000 to $17,700), the bank could immediately reimburse itself for the advance, and he would sell certain other securities and with the proceeds make the reduction of his original indebtedness as required by the Comptroller. To this change from the first arrangement the president of the bank agreed, drew the bank's check for $5,700, delivered it to the trust company, and received the certificate of stock. A few days later the president renewed negotiations with Salter, in which there was an unimportant misunderstanding as to whether Salter had contracted to take the stock or was merely considering its purchase. However that may be, it is certain that at that time Salter, acting and relying upon the president's false representations, did con-

tract to purchase the stock, if the bank would finance him. Then the president went to the bank's discount committee, and informed it of the whole situation, and received its full authority to sell Salter the stock and loan him money enough to buy it. Whereupon certificates already made out in Salter's name were handed him, and in return he gave the bank his check for $500 and his note for $5,500. Young failed to keep his bargain as revised by selling other securities and reducing his loan. Salter, in ignorance of the bank's condition, received dividends on his stock, and reduced his indebtedness from time to time, until at the appointment of the receiver, the bank held his note for but $4,400.

Upon the bank's failure, and upon his discovery of what was the bank's real condition at the time of his purchase, Salter tendered the receiver the stock, together with the amount of dividends received, and requested the return of his $4,400 note and the $1,600 he had paid on account of the purchase. The receiver refused this demand, and brought the action on the note which Salter by the bill in this proceeding seeks to enjoin.

[1] The learned trial judge found all facts and legal inferences in favor of Salter, save one; that one he considered an insurmountable obstacle to his relief. It has to do with the question whether the president of the bank was acting for the bank throughout, or was acting only as the agent of Young in the sale of his stock.

To ascertain the true nature of the transaction in which the bank sold Young's stock to Salter, it must at all times be kept in mind that the transaction had its inception with the Comptroller of the Currency demanding the reduction of Young's indebtedness. The bank was satisfied with Young's loan, the collateral being in excess of its amount; but the Comptroller was not satisfied, and therefore ordered its reduction. In pursuance of that order, the bank, being without option in the matter, proceeded to procure its reduction. In this it was acting solely for itself. Its first attempt, as we have shown, was to secure payment by Young, but was met by the obstacle that Young had no money. It next turned to Young's property. Young owned stock of the bank. So Young and the bank agreed that the bank should sell the stock and apply the proceeds to the loan, and in that way enable the bank to reduce the loan as demanded by the Comptroller. Acting upon this agreement, the bank began negotiations with Salter. To this point certainly the transaction was the bank's (and so thought the learned trial judge), and all would have been well had Young been able to perform his part of the undertaking by producing the certificates. The certificates, it developed, were held elsewhere in pledge. This was still another obstacle to the bank's compliance with the Comptroller's order, and necessitated another change in its manner of reducing the loan. This change was made upon Young's proposition that, if the bank would procure the shares by advancing money for their release and then sell them (applying the proceeds to the advance), he would sell other securities and turn over the proceeds to the reduction of the loan as ordered. This the bank agreed to do, having in view as before, the one object of reducing the loan. It was just here that the learned trial judge thought that in carrying out this revised ar-

rangement to accomplish the same result the bank ceased to act for itself and began to act as the agent of Young for the sale of his stock. We are unable to follow him to this conclusion.

It appears to us that the transaction received its character from the incident of its inception. That was a matter solely affecting the bank. That character remained and persisted so long as the bank continued in one fashion or another in an endeavor to obey the command of the Comptroller. The president was acting for the bank throughout, with but a single object in view, and that was to accomplish a thing required not of Young, but of the bank. The one purpose of the bank in selling Young's stock was to benefit itself. Its object was never to help Young dispose of his stock, but was always to help itself by getting money from Young's property in some way or other. The president's acts to this end were within the full knowledge and met with the entire approval of the bank's governing board. If Young had kept his second bargain and sold other securities and applied the proceeds to the reduction of his indebtedness, there could have been no question that the sale of the stock to Salter (in effect a condition precedent to the sale of Young's other securities, imposed by Young and agreed to by the bank) would have been the indirect means by which the bank would have secured the reduction of Young's loan and by which it would have obeyed the Comptroller's order. Young, however, repudiated or failed to perform his promise to sell other securities, but Young's failure to do as he had promised did not change the character of the bank's acts in doing what it had promised. Therefore we are unable to agree that the bank ceased to act for itself and began to act for Young, when, confronted by Young's vacillation, it endeavored to meet the demand of the Comptroller in a way different from the first, but in a way which, like the first, included the sale of Young's stock. We are of the opinion that the president was acting for the bank at the completion of the transaction as well as at its inception, and that, as it is not disputed that the purchase was induced and made upon his false representations, the transaction is void, and the bank, having authorized and approved the acts of its president, and having accepted and retained their fruits, must restore the purchaser to the situation in which he was before (Hindman v. Bank, 112 Fed. 931, 50 C. C. A. 623, 57 L. R. A. 108), if not relieved by other considerations.

[2-4] It is maintained by the receiver that, whatever Salter's rights were as against the bank before its failure, they have been lost or are incapable of enforcement against the bank's receiver. This contention, as stated in the brief, "is based solely upon the proposition that after insolvency and the fixing of the rights of the creditors, a purchaser of stock in a national bank cannot rescind his purchase."

To this proposition, so broadly stated, we cannot subscribe; and of the same inclination was the trial judge. It is based upon the theory that the stock of a bank represents its capital; that creditors have a right to look to its capital for the payment of its debts; that their rights are fixed by the appointment of a receiver, which preserves the capital for them undisturbed by stockholders seeking to get from under the legal liability of their stock ownership. In support of this very gen-

eral proposition no authorities are cited. The argument in support of it is made by analogy to certain undisputed principles affecting the liability of stockholders and the rights of creditors upon insolvency of a national bank and the appointment of a receiver. These apply to the double liability of a stockholder of a national bank under section 5151, R. S., and to the liability of a subscriber to stock in a national bank to complete his contract of subscription. Scott v. Deweese, 181 U. S. 202, 21 Sup. Ct. 585, 45 L. Ed. 822; Scott v. Abbott, 160 Fed. 573, 87 C. C. A. 475; Lyons v. Westwater, 181 Fed. 681, 104 C. C. A. 663; Westwater v. Lyons, 193 Fed. 817, 113 C. C. A. 617. It is to this double liability of the holder of full-paid shares and to the contractual liability of a subscriber to fully pay for his shares that creditors have a right to look for the payment of the bank's debts. But neither of these principles applies in favor of creditors and against Salter in this case, for Salter has met his liability under section 5151 by paying his assessment and disclaiming an intention to sue for its recovery, and he is not liable for an uncompleted contract of subscription, because the stock he purchased had previously been subscribed and fully paid. It is to that money which shares of stock produce as capital when they are subscribed and paid for that creditors have a right to look, not to the money which Salter thereafter paid the bank in buying its stock. If the purchase price of full-paid stock is treated, not as assets, but as capital, there would be a curious oversubscription of the bank's capital, in which each of Salter's shares would have contributed $300, $100 upon subscription, and $200 upon Salter's later purchase. This, of course, is impossible.

That Salter could have enforced a right of rescission against the bank (if such he had) before the appointment of a receiver is unquestioned. If so, it would be only because the rights of creditors were then no greater than his right of rescission. If creditors' rights in the capital were no greater than Salter's before the appointment of a receiver, they surely are no greater after. The rights of both with respect to capital are fixed by law, not by a change from solvency to insolvency of the bank, and by the consequent appointment of a receiver.

Salter's right to rescission was fixed by the fraud of the bank when the fraud was practiced. That was before receivership. He therefore approaches the receiver like an ordinary creditor whose claim was contracted before receivership, with a like right to redress out of the bank's funds in the hands of the receiver.

The decree below is reversed.