## OPPENHEIMER v. HARRIMAN NAT. BANK & TRUST CO. OF CITY OF NEW YORK et al.*

### No. 350.

Circuit Court of Appeals, Second Circuit.
Aug. 10, 1936.

*For opinion on rehearing see —— F.(2d) ——.

Greenbaum, Wolff & Ernst, of New York City (Edward S. Greenbaum, Newman Levy, and Benjamin Kaplan, all of New York City, of counsel), for appellant.

Conboy, Hewitt, O'Brien & Boardman, of New York City (Martin Conboy, David Asch, and William J. Butler, all of New York City, of counsel), for appellees.

Frederic P. Warfield, of New York City (Alfred L. Becker, of New York City, of counsel), for Louis J. Ehret as amicus curiæ.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The plaintiff, Henry E. Oppenheimer, was a depositor in the Harriman National Bank, of which Joseph W. Harriman was president and F. S. Williamson was a vice president. On October 28, 1930, Williamson called upon Oppenheimer, presenting a letter of introduction on bank stationery signed by Harriman. Relying upon statements made in the letter and oral statements made by Williamson, Oppenheimer was induced to purchase ten shares of stock of the bank at the price of $15,120. On November 1, he received from the bank a bill therefor which he paid by a check drawn upon his account in the bank and payable to its order. Another vice president of the bank, Mr. Austin, acknowledged receipt of his check and sent him a stock certificate for the purchased shares. His check was marked "Paid" and the bill was receipted. During 1931 and in January, 1932, Oppenheimer received dividends on the stock aggregating $525. He sold two shares in May, 1932, for the price of $2,408 and thereafter received a new certificate for his remaining eight shares. In the spring of 1933, when he saw a newspaper reference to the Singleton case,* he discovered that the statements which had induced his purchase were false and fraud-ulent. Thereupon, on May 6, 1933, he gave notice of rescission, tendered back the certificate, and demanded that his account in the bank be credited with the amount of his payment, less the sums received by him as dividends and from his sale of the two shares disposed of. The bank in the meantime had closed its doors and the defendant Cooper had been appointed its conservator. The plaintiff's demand for rescission being rejected, this action was instituted on May 31, 1933. It seeks judgment for $12,187 with interest from November 1, 1930. During pendency of the action, a receiver was appointed for the bank, but he has not become a party to this suit.

The amended answer of the defendants, besides a general denial, sets up the affirmative defenses of ratification after knowledge of the fraud, and of laches. At the trial the defendants were allowed further to amend "tentatively" by setting up that on and after March 4, 1933, the bank was insolvent and that debts incurred since November 1, 1930, cannot be paid out of its assets. The District Court reserved decision on whether this tentative amendment constituted a defense and never formally ruled upon it.

The defendants' proof tended to show that the stock purchased by Oppenheimer was not owned by the bank but by its affiliate, Harriman Securities Corporation. The bank maintained in its bond department an account known as "Harriman Securities Corporation Suspense Account," in which were reflected purchases and sales of Harriman Bank stock made for the account of said affiliate. To the extent that the account was long of the stock it represented an indebtedness of the affiliate to the bank. Certificates of stock purchased for the suspense account were put in the name of one Kelly, not an employee of the bank, as nominee of the Securities Corporation. The ten shares sold to Oppenheimer stood in Kelly's name, and the suspense account was credited with the sum received by the bank from Oppenheimer, less $100 retained by the bank as its commission on the sale. It is conceded, however, that Oppenheimer had no knowledge of any transactions between the bank and its affiliate and believed that he was dealing with the bank as a principal in his purchase of the stock. It is also conceded that a fraud was practised upon him by

584

Harriman and Williamson, the dispute as to this being only whether the bank is chargeable with their fraud.

At the conclusion of the evidence both parties moved for a directed verdict. The District Judge granted the defendants' motion on the ground (1) that the bank was not enriched by the sale of the stock to Oppenheimer, and (2) that neither Harriman nor Williamson had actual or apparent authority to make the representations which induced his purchase. From the judgment entered pursuant to the directed verdict the plaintiff has appealed.

■ At the outset we may conveniently dispose of the bank's argument that recovery by the plaintiff is prohibited by the provisions of section 24 of the National Banking Act as amended by the Act of February 25, 1927 (44 Stat. 1226, § 2). This amendment provided that buying and selling of bonds, notes, or debentures, commonly known as investment securities, should be limited to buying and selling "without recourse." To say the least, it is highly doubtful whether this language can be stretched to include the purchase and sale of stock, and particularly of the bank's own stock. Compare the amendment of August 23, 1935, which uses the words "securities and stock" (49 Stat. 709, § 308 [12 U.S.C.A. § 24]). But assuming that it can, the statute would still be inapplicable to the case at bar. The evil aimed at by the statute was the incurring of liability by the bank in consequence of an indorsement, guaranty, or repurchase agreement with respect to securities it sold. Awotin v. Atlas Exchange Bank, 295 U.S. 209, 211, 55 S.Ct. 674, 79 L.Ed. 1393. It had nothing to do with tort liability arising out of fraud; nor can it be construed to forbid incurring the liability imposed by law when a contract of sale, induced by fraud, is rescinded.

■■ Much of the argument in the briefs is directed to the controverted question whether the bank, as a principal, sold its own stock, or, as an agent, sold stock owned by the Securities Corporation. We cannot see that this dispute is at all material here. In either event, the plaintiff dealt only with the bank; he had no knowledge that any third party was involved. If the bank sold stock belonging to its affiliate, as the defendants contend, it sold for an undisclosed principal and was itself a party to the contract. American Law Institute,

Restatement of Agency, § 322. When an agent for an undisclosed principal induces a sale by fraud, he must account for the purchase price, if the contract is rescinded, even though he has paid it over to his principal. Id., § 341; McClure v. Central Trust Co., 165 N.Y. 108, 58 N.E. 777, 53 L.R.A. 153. Therefore, whether the stock belonged to the bank or to the Securities Corporation, the fundamental issue is the same, namely, whether the fraudulent representations of Harriman and Williamson are attributable to the bank.

■ Despite the defendants' contention to the contrary, we think it indubitably plain that these officers had apparent, if not actual, authority to make the sale on behalf of the bank. If the stock was property of the bank, its acquisition of it may have been ultra vires, for only in special circumstances may a bank purchase its own stock. 12 U.S.C.A. § 83. Nevertheless a corporation may transfer title to property which it was ultra vires to acquire (Lantry v. Wallace, 182 U.S. 536, 553, 21 S.Ct. 878, 45 L.Ed. 1218); and the plaintiff is not charged with notice that its ownership was unlawful, since under some circumstances it could be lawfully acquired. National Bank & Loan Co. v. Petrie, 189 U.S. 423, 424, 23 S.Ct. 512, 47 L.Ed. 879. The sale appeared to be lawful, and the bank's president and vice president had apparent authority to represent it in negotiating such sale. If, on the other hand, the stock belonged to the Securities Corporation, these officers would have actual authority to cause the bank to make a sale as agent for the owner, whereby a commission was earned for the bank and the proceeds of the sale were applied to reduce the owner's indebtedness to the bank. Hence whichever the ownership of the stock, the officers who negotiated with the plaintiff had at least apparent authority to make the sale. If this be so, their representations incidental to the sale by the bank (either as principal or agent) are attributable to the bank, since the plaintiff had no notice that the representations were unauthorized. Salter v. Williams, 244 F. 126, (C.C.A. 3); American Law Institute, Restatement of Agency, §§ 257, 258; 7 Michie, Banks and Banking, § 173.

■ Therefore, if the bank were still a going concern, we should entertain no doubt that the plaintiff would have the right to rescind his purchase, unless he has lost it by laches, or estoppel, which has not

been contended. National Bank & Loan Co. v. Petrie, 189 U.S. 423, 23 S.Ct. 512, 47 L.Ed. 879; American Law Institute, Restatement, Contracts, §§ 476 (1), 480 (1). Nor would the power to rescind be lost by reason of his disposal of two of the purchased shares before discovery of the fraud, since prejudice to the bank is avoided by crediting it with the proceeds thereof. American Law Institute, Restatement, Contracts, § 480(2) (e); J. C. Miller Estate, Inc., v. Drury, 120 Wash. 628, 208 P. 77, 79; Henninger v. Heald, 52 N.J.Eq. 431, 29 A. 190, 193, affirmed 53 N.J.Eq. 694, 35 A. 1130; Harnden v. Hadfield, 113 Kan. 525, 215 P. 441, 442; Bagnall v. Frank Fehr Brewing Co., 203 Mo.App. 635, 221 S.W. 793, 795. See Ufland & Co. v. McMahon, 215 App.Div. 267, 279, 213 N.Y. S. 519. But the amended answer alleges that the bank was insolvent on and after March 4, 1933. This was prior to the plaintiff's demand for rescission on May 6, 1933, and the appellees contend that supervening insolvency is enough to preclude rescission.

 The record contains a concession that the bank was insolvent on March 3, 1933. Since insolvency antedated the plaintiff's demand for rescission, he cannot thereby change his status from that of shareholder to that of creditor to the detriment of general creditors. Under the federal statute as to shareholders' liability (12 U.S.C.A. § 63), it is well settled that a defrauded shareholder, who had not rescinded at the time of the bank's insolvency, cannot escape payment of an assessment made by the comptroller to meet the deficiency of assets available for the payment of all who were creditors when the bank failed. Scott v. Deweese, 181 U.S. 202, 213, 21 S.Ct. 585, 45 L.Ed. 822; Lantry v. Wallace, 182 U.S. 536, 549, 21 S.Ct. 878, 45 L.Ed. 1218; Ryan v. Mt. Vernon Nat. Bank, 224 F. 429, 430 (C.C.A. 2); Anderson v. Cronkleton, 32 F.(2d) 170 (C.C.A.8). By necessary implication the statute renders not only the fund raised by assessment, but also all of the insolvent bank's assets security for the payment of those who were creditors at the time of the bank's failure. Obviously, one who is liable to such creditors as a stockholder for assessment can neither reduce the amount he has paid as assessment nor come in to share assets he is bound to leave to the prior satisfaction of those creditors. In so far as Salter v. Williams, 244 F. 126 (C.C.A. 3), teaches the contrary, it overlooks the necessary implication of the liability statute in the case of insolvent national banks, and we cannot follow it. Conceivably, however, there may arise a situation in which after distribution to creditors of the bank's liquidated assets and the proceeds of the assessment, other hitherto dubious assets may realize sufficient to pay off fully the above-mentioned creditors and to leave a balance remaining to the bank. It is urged by the plaintiff that such a possibility exists here by reason of a suit brought by the receiver against certain banks on an alleged guaranty of the Harriman Bank's depositors. If by good fortune a balance should remain for distribution to shareholders, it would seem that the defrauded plaintiff should be paid in preference to distribution to nondefrauded shareholders. So, in effect, this court held in MacNamee v. Bankers' Union, 25 F.(2d) 614. See, also, Joyce & Co. v. Eifert, 56 Ind.App. 190, 105 N.E. 59. We conclude, therefore, that even if insolvency antedated the plaintiff's demand for rescission, rescission should be allowed as against the corporation, although the judgment will give the plaintiff no claim entitled to share in the assets of the receivership until after payment of all who were creditors when the bank became insolvent. Such a judgment will very likely have only an academic value, but such as it is the plaintiff would seem to be entitled to it. Accordingly, the judgment on appeal is reversed and the cause remanded, with directions to enter judgment for the plaintiff in conformity with this opinion.