## OPPENHEIMER *v.* HARRIMAN NATIONAL BANK & TRUST CO. ET AL.*

No. 588. Argued March 11, 12, 1937.—Decided April 26, 1937.

---

* Together with No. 670, *Harriman National Bank & Trust Co.* v. *Oppenheimer,* also on certiorari to the Circuit Court of Appeals for the Second Circuit.

*Mr. Edward S. Greenbaum,* with whom *Messrs. Theodore S. Jaffin* and *Benjamin Kaplan* were on the brief, for Oppenheimer.

*Mr. Martin Conboy,* with whom *Messrs. George P. Barse* and *John F. Anderson* were on the brief, for The Harriman National Bank & Trust Co.

MR. JUSTICE BUTLER delivered the opinion of the Court.

For some years prior to the occurrences out of which this litigation arose the defendant bank was doing business in New York City. Being unable to meet current demands, it closed March 3, 1933. March 13 a conservator was appointed; [1] October 16 the comptroller declared

---

[1] 12 U. S. C., § 203.

it insolvent and appointed a receiver.[2] Later, he assessed the stockholders par value of their stock.[3] May 31, Oppenheimer brought this action in the federal court for the southern district of New York to recover damages upon an executed rescission of a sale to him of stock of the bank by means of fraudulent representations made by its president and vice president. At the close of the evidence, the parties respectively sought a directed verdict, and, no request for submission of any issue to the jury having been made,[4] the court found the bank not enriched by the sale, and the president and vice president without actual or apparent authority to make representations in connection with the sale, and directed a verdict and entered judgment for the bank. The Circuit Court of Appeals reversed and ordered that judgment for the amount demanded in the complaint be entered against the bank collectible out of assets of the receivership after payment in full of all who were creditors when the bank became insolvent. 85 F. (2d) 582.

Plaintiff applied for a writ of certiorari, contending that the Circuit Court of Appeals erred in holding that his judgment is not entitled to rank with other unsecured creditors' claims and that its ruling conflicts with decisions of other Circuit Courts of Appeals.[5] Defendant presented its cross-petition asserting that the court erred in

---

[2] 12 U. S. C., § 191.

[3] 12 U. S. C., §§ 63, 64; see also § 192.

[4] *Beuttell* v. *Magone,* 157 U. S. 154, 157. *Empire State Cattle Co.* v. *Atchison, T. & S. F. Ry. Co.,* 210 U. S. 1, 8. *Sena* v. *American Turquoise Co.,* 220 U. S. 497, 498. *American National Bank* v. *Miller,* 229 U. S. 517, 520. *Williams* v. *Vreeland,* 250 U. S. 295, 298.

[5] *Salter* v. *Williams,* (C. C. A. 3rd) 244 Fed. 126, 129. *Florida Land & Imp. Co.* v. *Merrill,* (C. C. A. 5th), 52 Fed. 77, 80; *Merrill* v. *Florida Land & Imp. Co.,* 60 Fed. 17. *Williams* v. *Green,* (C. C. A. 4th) 23 F. (2d) 796, 797. *Clark* v. *Boston-Continental Nat. Bank,* (C. C. A. 1st) 84 F. (2d) 605, 607. And see *Lantry* v. *Wallace,* 182 U. S. 536, 555.

holding: that plaintiff is entitled to participate in the distribution of proceeds of assessments on stockholders collected under 12 U. S. C., § 64; that it may be compelled to take and pay for shares of its own capital stock in a manner not authorized by 12 U. S. C., § 83; that it is liable for fraud of its officers in connection with the sale of shares which were the property of another, the bank not being enriched by the transaction; and that plaintiff is entitled to judgment against defendant. This court granted both petitions.

November 1, 1930, plaintiff purchased 10 shares of the bank's stock for $15,120. He was induced to buy the stock by false and fraudulent representations of the president and vice president of the bank. It sent him a bill for the purchase price. Having considerably more on deposit in the bank, plaintiff sent his check for that amount drawn on it and payable to its order. A vice president acknowledged receipt of the check and sent plaintiff a stock certificate for the shares purchased. His check marked paid and the bill receipted were returned to him. Plaintiff received dividends on the stock amounting to $525 and sold two shares for $2,408. Later, May 6, 1933, he gave the bank notice of rescission, tendered it the certificate and demanded that his account be credited with the amount of his payment less the sums he had received as dividends and from the sale of the two shares. The bank rejected his demand; he brought this suit for $12,187 with interest and costs. In addition to a general denial, defendant's answer set up affirmative defenses of ratification after knowledge of the fraud and of laches but at the trial these were abandoned.

Defendant's evidence tended to prove that the stock was not owned by it but by Harriman Securities Corporation, the shares of which were held in trust for the benefit of the stock of the bank. The bank maintained in its bond department a "suspense account" in which

were reflected purchases and sales of its own stock made by it for account of that corporation. The bank lent the affiliate the sums required for purchasing the stock and the amounts were charged to the latter. When the stock was sold the proceeds were credited to the affiliate. Stock so purchased was taken in the name of Kelly, not an employee of the bank, as nominee of the affiliate. The shares in question were so held. Of the amount paid by plaintiff $100 was retained by the bank as its commission for making the sale; the balance was entered in the suspense account. Plaintiff had no knowledge of any transactions between the bank and its affiliate; he believed he was dealing with the bank as principal. He has paid the assessment that the comptroller made against him as stockholder and has not challenged its validity or sought repayment of any part of it.

■ Defendant maintains that a national bank may not incur liability to retake shares of its stock sold by it either as principal or agent.

It cites provisions of Title 12, U. S. C., governing national banking associations, the substance of which follows. Section 24 (Seventh) limits the business of dealing in securities and stock to purchasing and selling without recourse. Section 56 prohibits withdrawal of capital by dividends or otherwise. Section 59 permits reduction of capital by vote of two-thirds of the stock. Section 83 declares that no such association shall make any loan or discount on the security of its own capital stock nor be a purchaser or hold its shares unless the security or purchase shall be necessary to prevent loss upon a debt previously contracted; it requires that the stock so obtained shall be sold within six months.

Defendant suggests that, save as otherwise definitely authorized, these provisions require that the outstanding stock of a national bank shall not be reduced while its banking operations continue. On that basis it main-

tains that to enforce rescission would in effect allow a national bank to repurchase its stock and so to accomplish by indirection what it may not do directly.

The bank had power to sell the stock in question whether acquired by it in accordance with or contrary to § 83,[6] and whether the stock belonged to it, the affiliate or a third party.[7] As the stock was fully paid in when originally issued, recovery by the plaintiff would not violate statutory provisions prohibiting reduction of capital.[8] It is to be remembered that plaintiff has fully paid his statutory liability. The bank's liability does not differ from what it would be if, instead of shares of its own stock, it had fraudulently sold to plaintiff bonds or other investment securities.[9] It cites § 24 (Seventh) as construed in *Awotin* v. *Atlas Exchange Bank,* 295 U. S. 209. But that decision does not support its contention. There the bank sold bonds and in connection with the sale agreed with the buyer that at maturity it would repurchase at par value and accrued interest. We held the agreement repugnant to § 24 (Seventh) requiring sales to be without recourse. The sale was a valid executed contract; the bank's promise to repurchase was forbidden by law and therefore void. The purchaser, chargeable with knowledge of the statute, could not invoke estoppel. The statutes relied on by defendant cannot reasonably be construed to forbid rescission of fraudulent sales by national banks of their own stock. In the absence of language unquestionably disclosing that purpose, Congress may not be held to have so in-

---

[6] *Lantry* v. *Wallace,* 182 U. S. 536, 553. *Scott* v. *Deweese,* 181 U. S. 202, 211. *National Bank of Xenia* v. *Stewart,* 107 U. S. 676. *National Bank* v. *Matthews,* 98 U. S. 621, 629.

[7] 12 U. S. C. § 24 (Seventh). *Awotin* v. *Atlas Exchange Bank,* 295 U. S. 209, 212.

[8] *Salter* v. *Williams,* 244 Fed. 126, 130.

[9] Cf. *National Bank & Loan Co.* v. *Petrie,* 189 U. S. 423, 425.

tended. There is no evidence of that intention. Defrauded purchasers may rescind fraudulent sales by national banks of their own capital stock.

■ Defendant maintains that it may not be held liable for misrepresentations made by its officers when making the sale to plaintiff. It does not challenge the authority of its president or vice president to act for it in making sales of investment securities or stock. Through them it represented to plaintiff that the shares offered him belonged to an estate, made the sale, obtained his check for the purchase price, took the amount from his deposit, issued and sent him a stock certificate. If, as it claimed at the trial, the shares belonged to its affiliate, the latter was an undisclosed principal, and plaintiff was entitled to look to the bank as if acting for itself.[10] It is immaterial whether, as between the bank and its affiliate, the amount obtained from plaintiff belonged to the former or was received by it as agent for the latter.

■ Defendant maintains that the proceeds of assessments may not be charged with the claim of a rescinding shareholder.

It argues that, the bank being insolvent and in receivership, the recovery cannot be had from the assets of the bank and will of necessity come out of the money paid by shareholders. It calls attention to § 64 which declares that stockholders shall be held individually responsible for all "contracts, debts, and engagements" of the bank.

But that contention misconstrues the judgment directed below. It is to be "collectible out of the assets of the receivership after payment in full" of others. Manifestly the assets referred to are not limited to assessments collected from stockholders but include assets passing from the bank to the receiver. The phrase quoted from

---

[10] *McClure* v. *Central Trust Co.*, 165 N. Y. 108, 128; 58 N. E. 777.

§ 64 relates to the liability of stockholders enforceable upon finding of insolvency, appointment of receiver and assessment by the comptroller, and not to provability or rank of claims. His determination as to the necessity and amount of assessments against shareholders is conclusive upon them and immune from collateral attack.[11] The bank may not in this suit invoke the rights of stockholders to defeat plaintiff's claim against it.

Moreover, the quoted provision was enacted for the protection of the public dealing with national banks and should be reasonably construed in favor of claimants against them. To give full effect to the purpose of Congress a liberal construction is required. A technical or narrow view would be inconsistent with the true intent and meaning of the measure. There is nothing in the purpose or context of the statute to detract aught from the significance that fairly may be attributed to the words used. They are broad enough to include all pecuniary liabilities and obligations of the bank. Indeed, that is a well-recognized meaning of the word "engagement." Plaintiff's claim is for the money the bank fraudulently got from him and used in its business. Clearly that liability is covered by the phrase "contracts, debts and engagements."[12] The construction for which the defendant contends cannot be sustained.

■ There remains the question whether plaintiff's judgment is entitled to share equally in the receivership estate with other unsecured creditors' claims.

In 1930 when the bank by false representations sold him the stock and by that means obtained the price out of his deposit it immediately became bound to make res-

---

[11] See *Forrest* v. *Jack*, 294 U. S. 158, 162, and cases cited.

[12] See e. g. *Chesapeake & Ohio Canal Co.* v. *Knapp*, 9 Pet. 541, 566. *United States* v. *State Bank*, 96 U. S. 30, 35–36. *Thomas* v. *Matthiessen*, 232 U. S. 221, 235. *Haviland* v. *Chace*, 39 Barb. 283, 287.

titution.[13] The fraudulent sale was subject to rescission by the plaintiff at any time before the bank closed. Neither lapse of time while plaintiff remained ignorant of the fraud nor insolvency of the bank detracted from its liability. We assume that after March 3, 1933, the bank was without means sufficient to meet current demands and that its debts exceeded the value of its assets plus the statutory liability of its stockholders. After the appointment of a conservator, but some months before the comptroller declared the bank insolvent, plaintiff rescinded and brought this suit. He claims no lien, preference, or priority but merely seeks to share in the estate as do other unsecured creditors.

While stockholders' liability may not be enforced before insolvency and assessment by the comptroller, we assume, without deciding, that plaintiff's position is the same as if the bank's insolvency had been declared and a receiver appointed before he rescinded. Plaintiff appeared by the bank's records to be a stockholder and, as against creditors for whose benefit the statutory liability was created, was estopped from denying that status.[14] Recognizing that the bank's fraud and his rescission availed nothing against the comptroller's assessment, plaintiff paid the amount laid against him. The judgment he seeks would establish his right to have the bank pay, because wrongfully obtained from his deposit,

---

[13] Cf. *Briggs* v. *Brushaber*, 43 Mich. 330, 332; 5 N. W. 383. *Northrop* v. *Hill*, 57 N. Y. 351, 355. *Trayne* v. *Boardman*, 207 Mass. 581, 582; 93 N. E. 846. *Sollund* v. *Johnson*, 27 Minn. 455, 456; 8 N. W. 271. *Union Central Life Insurance Co.* v. *Schidler*, 130 Ind. 214, 216; 29 N. E. 1071. *Griffin* v. *Lumber Co.*, 140 N. C. 514, 517; 53 S. E. 307. *McKay* v. *McCarthy*, 146 Ia. 546, 550–551; 123 N. W. 755.

[14] *Scott* v. *Deweese*, 181 U. S. 202, 213. *Lantry* v. *Wallace*, 182 U. S. 536, 553.

the amount for which this suit is brought. And, having fully paid his liability to the creditors, there is no reason why his claim should be subordinated to claims of stockholders on account of their deposit balances when the bank failed. The record shows that plaintiff then had a substantial amount on deposit. The bank does not claim that, in respect of deposits or other indebtedness, stockholders are not entitled to distribution on the same basis as are non-stockholding creditors. There is no foundation for any such rule. Subscription price having been fully paid to the bank, the maximum for which stockholders may be held for the benefit of creditors is the par value of their shares. By payment of the comptroller's assessments they fully discharge their liability as stockholders. And as claimants they stand on the same footing as other creditors.[15] Discrimination against their claims is not authorized by the statute. It follows that plaintiff's judgment is entitled to rank on a parity with other unsecured creditors' claims.[16]

The judgment of the Circuit Court of Appeals will be reversed and the case will be remanded to the district court for further proceedings in accordance with this opinion.

*Reversed.*

---

[15] *Richardson* v. *Olivier,* 105 Fed. 277, 280.

[16] *Salters* v. *Williams,* 244 Fed. 126, 129. *Florida Land & Imp. Co.* v. *Merrill,* 52 Fed. 77, 80. *Williams* v. *Green,* 23 F. (2d) 796, 797. *Clark* v. *Boston-Continental Nat. Bank,* 84 F. (2d) 605, 607.