CONTINENTAL ASSURANCE COMPANY, an Illinois insurance company, Plaintiff,

v.

AMERICAN BANKSHARES CORPORATION, et al., Defendants.

No. 76–C–248.

United States District Court, E. D. Wisconsin.

May 14, 1982.

Irvin B. Charne, Howard A. Pollack, Milwaukee, Wis., Harding A. Orren, Richard L. Voelbel, Robbins, Davis & Lyons, Minneapolis, Minn., for plaintiff.

William H. Alverson, Godfrey & Kahn, Milwaukee, Wis., for Ernst & Ernst.

Robert E. Hackett, Jr., Milwaukee, Wis., for Trecker.

Gregory J. Harrold, Milwaukee, Wis., for Erickson.

Dominic S. Amato, Joseph F. Wresching, Milwaukee, Wis., for Wiersdma.

Ronald L. Wallenfang, Quarles & Brady, Milwaukee, Wis., for Deshur, Heifetz, Kor-pady, Lauterbach, Lesselyoung, Lichtsinn, Pearce, Colburn, Bruce, DeBelak & Schwingle.

Richard L. Cates, John C. Carlson, Madison, Wis., for Cahill.

David J. Cannon, Glenn A. Buse, Michael, Best & Friedrich, Milwaukee, Wis., for Wegmann.

Reuben W. Peterson, Jr., Milwaukee, Wis., for Colonial Bank.

David E. Leichtfuss, Walter S. Davis, Clifford B. Buelow, Milwaukee, Wis., for Benz & Wright.

William J. French, Milwaukee, Wis., for FDIC.

James Gordon, Chicago, Ill., for Colonial Bank.

John D. Bird, Jr., Milwaukee, Wis., for Scroggins & Rodi.

Michael A. Campbell, Donald A. Sands, Milwaukee, Wis., for Zuckerman.

## MEMORANDUM AND ORDER

WARREN, District Judge.

This action arises out of the closing of American City Bank ("American") in October of 1975. Plaintiff Continental Assurance Corporation ("Continental"), the holder of a Subordinated Capital Note issued by American in April of 1973, seeks to recover $2,000,000.00, the amount of the note, from a number of defendants on various grounds of alleged liability.

Two motions are currently pending before the Court. Ernst & Whinney (formerly, Ernst & Ernst) and eleven former directors of American who are named as defendants in Continental's complaint have asked the Court to order a separate trial on Continental's claims against the Federal Deposit Insurance Corporation, which is a defendant in this action solely in its capacity as receiver for American ("the Receiver"). Ernst & Whinney and the director defendants also seek a stay of all further proceedings against them until after Continental's claims against the Receiver are resolved. In addition, the Receiver has filed a

motion for summary judgment seeking dismissal of Continental's claims against it. These motions are the subject of this memorandum and order.

## I. *Background*

The events which led to the commencement of this action, insofar as they relate to the motions currently pending before the Court, are undisputed.

On July 31, 1972, American filed an application with the Comptroller of the Currency to convert its status from a state bank to a national banking association. The minutes of American's October 18, 1972 Board of Directors reveal that the application was approved "conditioned upon our selling $2,000,000.00 of debentures within a six month period." (Groll affidavit, exhibit 2).

Late in 1972, American contacted Continental seeking funds to comply with the Comptroller's capital requirement, and in early 1973, they began the negotiations which led to the Note Agreement in issue in this action. On April 10, 1973, after several months of negotiations, the two parties executed the Note Agreement. Several provisions of the agreement are of particular importance in resolving the Receiver's motion for summary judgment. Section 1.1 provides:

> The Notes will not constitute a deposit and will not be insured by the Federal Deposit Insurance Corporation. In addition, *the Notes will be unsecured subordinated obligations of the Bank* and ineligible as collateral for a loan by the Bank. (emphasis added.)

Section 3.1 provides for the subordination of the Notes as follows:

> Section 3.1. The payment of principal of and the premium, if any, and interest on the Notes is hereby expressly subordinated in right of payment to the extent and in the manner hereinafter set forth in Sections 3.2 through 3.3, to the prior payment in full of all indebtedness incurred by the Bank in the ordinary course of business, as that term is defined in Section 5.1(b) hereof, whether outstanding on the date of the original issue of the Notes or incurred after such date.

> The indebtedness, obligations and liabilities to which the Notes are subordinated are hereinafter sometimes referred to as the "Senior Liabilities."

> Section 3.2. In the event of any distribution, division or application, ... which ... occurs by reason of liquidation, dissolution or other winding up of the Bank or by reason of any receivership, insolvency or bankruptcy proceedings, ... then in any event the Senior Liabilities shall be preferred in payment over the Notes and such Senior Liabilities shall be first paid and satisfied in full before any payment or distribution of any kind or character, whether in cash, property or securities ... and in any such event any payment, dividend or distribution ... otherwise payable in respect thereof shall be paid and applied on the Senior Liabilities, pro rata among the holders of Senior Liabilities, until the Senior Liabilities have been fully paid.

> Section 3.3. These subordination provisions are solely for the purpose of defining the relative rights of the holders of the Notes, on the one hand, and the holders of Senior Liabilities, on the other hand, and nothing contained herein or elsewhere in this Agreement or in the Notes is intended to or shall (i) impair, as between the Bank and the holders of the Notes, the obligation of the Bank, which is unconditional and absolute, to pay to the holders of the Notes the principal of and the premium, if any, and interest on the Notes as and when the same shall become due and payable in accordance with their terms, ... subject only to the rights, if any, under these subordination provisions of the holders of Senior Liabilities in respect of cash, property or securities of the Bank payable upon the exercise of any such remedy.

Section 5.1 defines the terms "Deposit Liabilities" and "indebtedness incurred in the ordinary course of business" as follows:

> (a) The term "Deposit Liabilities" of the Bank shall mean obligations of the Bank which under generally accepted accounting principles applicable to banks

are classified upon a statement of condition under the heading of total deposits.

(b) The term "indebtedness incurred by the Bank in the ordinary course of business" shall mean any liability or obligation of the Bank with respect to ... (xi) any other liability or obligation of the Bank incurred in the normal course of business and not involving an obligation of the Bank for borrowed money, or (xiii) its obligations to the Federal Deposit Insurance Corporation ("F.D.I.C.") and any rights acquired by the F.D.I.C. as a result of loans by the F.D.I.C. to the Bank, or the purchase or guaranty of any of its assets by the F.D.I.C. pursuant to the provisions of Title 12, U.S.Code, Section 1823(c), (d) or (e); provided however that the term "indebtedness incurred by the Bank in the ordinary course of business" shall not in any event include any indebtedness or liability which by its terms is made subordinate and junior in right of payment to any other indebtedness or liability of the Bank, except that such term shall include all obligations and liabilities of the Bank to the F.D.I.C. of the type described in subsection (xiii) of this Section 5.1(b).

Despite the infusion of the additional $2,000,000.00 into American's capital structure, its financial situation continued to deteriorate. American attempted to seek new sources of capital throughout 1973, 1974 and 1975. However, it failed to raise adequate capital and, on October 21, 1975, the Comptroller of the Currency declared it insolvent and appointed FDIC as its receiver. The FDIC, as receiver, then entered into a purchase and assumption transaction with the Marine National Exchange Bank of Milwaukee (Marine).

Under the terms of the purchase and assumption agreement, Marine assumed liabilities of American of $113,179,424.00 and purchased assets it found acceptable for $42,530,456.00. This transaction produced a shortfall to Marine of $70,648,968.00, which the Receiver agreed to make up in cash. To obtain the cash to make up the shortfall, the Receiver sold to the FDIC, in its corporate capacity, assets which were unacceptable to Marine.

Continental commenced this action in April 1976. The original complaint contained sixteen claims, ten of which now remain. Five of the remaining claims name the Receiver as a defendant (counts 1, 2, 4, 5 and 6).

## II. *Motion for Summary Judgment*

The Receiver's position throughout this litigation has been that Continental, as an unsecured subordinated creditor of American, may not be compensated for its losses until after all general creditors, including itself by virtue of 12 U.S.C. § 1823(c), have been compensated for their losses. It argues that Continental's status as a subordinated creditor became unalterably fixed on the date of American's insolvency. It further argues that fraud is not a sufficient ground upon which a holder of a subordinated capital note issued by a federally regulated financial institution may change its status to that of a general creditor.

Both Continental and Ernst & Whinney oppose the Receiver's motion for summary judgment. Ernst & Whinney contends the subordination clause in Continental's Note has not come into operation because the FDIC has made no loans or guarantees and has purchased no assets, except those assets which were unacceptable to Marine. Ernst & Whinney further contends that, under the national banking laws, all creditors of a failed bank are entitled to a ratable distribution of a failed bank's assets regardless of whether they are general creditors or holders of subordinated notes. Finally, Continental contends defrauded subordinated creditors may elevate their status through rescission.

### A. The Subordination Agreement.

■ The Court has little difficulty in rejecting Ernst & Whinney's contention that the subordination clause has not come into operation. The subordination language in the Note Agreement requires subordination of all "indebtedness incurred by the bank in the ordinary course of business" which is defined in Section 5.1(b)(xiii) to include

"any rights acquired by the FDIC as a result of ... the purchase or guaranty of any of its assets by the FDIC pursuant to the provisions of Title 12, U.S.Code, § 1823(c), (d) or (e)." Consequently, when the FDIC, in its corporate capacity, purchased from the Receiver those assets which were unacceptable to Marine, the subordination clause became operative.

■ The Court also has little difficulty in concluding that, absent rescission, Continental's status as a subordinated creditor did not change as a result of American's insolvency. Under Section 194 of the National Bank Act, the Receiver, when making ratable dividends, is required to determine the status of creditors as of the date of insolvency. *Merrill v. National Bank*, 173 U.S. 131, 19 S.Ct. 360, 43 L.Ed. 640 (1899); *White v. Knox*, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884); *Kennedy v. Boston-Continental National Bank*, 84 F.2d 592 (1st Cir. 1936); *Kershaw v. Jenkins*, 71 F.2d 647 (10th Cir. 1934). As of October 21, 1975, Continental was a subordinated creditor of American.

B. Ratable Distribution.

■ Having rejected the contention that the subordinate language of the Note Agreement has never become operative, the Court now turns to Ernst & Whinney's contention that, under 12 U.S.C. § 194, *all* creditors are entitled to a ratable distribution of a failed bank's assets regardless of whether they are general creditors or holders of subordinated notes.

This question is one which has not been addressed by the Supreme Court or any of the circuit courts. In fact, the parties have directed the Court's attention to only one case which even discusses the issue: *Federal Deposit Insurance Corporation, as Receiver of Franklin National Bank v. Federal Deposit Insurance Corporation, as Receiver of the United States National Bank, et al.*, Civil No. 73–505–E (S.D.Cal.1980).

In *Franklin National*, the FDIC as receiver of the Franklin National Bank ("Franklin") brought suit against itself as receiver of the United States National Bank ("USNB"), to rescind a subordinated capital note agreement and to recover the $5,000,-000.00 paid by Franklin to USNB to purchase the subordinated note. In granting the defendant's motion for summary judgment, the Court, *inter alia*, held that under the terms of the banks' subordinated capital note agreement Franklin National's claims were subordinated to "Senior Obligations," including the FDIC Corporation's loan to the FDIC as receiver of USNB. In reaching that decision, Judge Enright did not discuss section 194; rather, he relied solely on the language of the Note Agreement itself. Consequently, his decision does not resolve Ernst & Whinney's contention that section 194 demands equal treatment to general creditors and subordinated note holders.

Although Judge Enright did not discuss section 194, it is this Court's opinion that his holding is consistent with that section and the policies underlying that section. Two related factors lead the Court to this conclusion. First, Continental, when it entered into the Note Agreement, knew the note was uninsured and subordinated to claims of general creditors, including the FDIC. Nevertheless, in exchange for a "premium" in the form of an interest rate exceeding the interest rate available to insured depositors, it chose to accept the risks accompanying its status. To allow it to rescind that agreement now would be unfair to those creditors and depositors who did not receive the premium which Continental received.

Second, Continental knew, when it entered into the Note Agreement with American, that the Comptroller had conditioned American's change in status to a national banking association on its obtaining an additional $2,000,000.00 in debentures. It also knew, or should have known, that these debentures were intended to provide a capital "safety cushion" for American's depositors and general creditors. To allow Continental to rescind that agreement now solely because the subordination clause became operative would totally undercut the purpose of the Comptroller's capital requirement.

In reaching this decision, the Court rejects Ernst & Whinney's contention that *First Empire Bank v. Federal Deposit Insurance Corporation*, 572 F.2d 1361 (9th Cir. 1978) *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1979) is controlling. That case dealt with a holder of letters of credit, a creditor on the same "strata," as general creditors. It did not discuss priority of distribution of assets when subordinated creditors and general creditors are involved.

Based on the foregoing, the Court rejects Continental's contention that subordinated note holders are entitled under section 194 to share equally with general creditors in the distribution of assets of a failed bank.

### C. Recission.

■ Ordinarily, general contract principles permit a party to rescind an agreement if the agreement itself is invalid due to fraud. *Franklin National, supra.* Therefore, absent statutory or policy considerations dictating a contrary result, the subordination language of the Continental-American Note Agreement, standing alone, would not compel summary judgment for the Receiver.

■ The Receiver implicitly recognizes that fraud ordinarily would permit Continental to rescind the subordination provisions of the Note Agreement, allowing it to share pro rata with all general creditors. The Receiver contends, however, that rescission is not a remedy available to a defrauded subordinated creditor against it following the insolvency of a federally regulated and insured financial institution.

In support of its contention that fraud is not a sufficient basis for permitting Continental to elevate its status to that of general creditor, the Receiver has directed the Court's attention to two cases the Court finds relevant: *In re Weis Securities*, 425 F.Supp. 212 (S.D.N.Y.1977), *aff'd.* 605 F.2d 590 (2nd Cir. 1978) and the *Franklin National* decision previously discussed.

*Weis* arose in the context of a broker-dealer liquidation under the provisions of the Securities Investors Protection Act. In that action, the holders of subordinated debenture notes alleged fraud and sought to rescind their subordination agreements in order to place themselves in the same position in the liquidation proceedings as unsubordinated creditors and customers. Both the district court and court of appeals held it was not necessary for general creditors to prove they relied on the subordination agreements to share in the proceeds prior to the note holders. In reaching its decision, the court of appeals placed great weight on the fact that the subordination agreement enabled Weis to comply with the net capital rules of the Securities Exchange Commission and New York Stock Exchange, and thus to continue to deal with the public. The purpose of those rules was to ensure that a dealer would always be sufficiently liquid to cover his current indebtedness, in order to be able at all times to promptly meet the demands of his customers. The court stated:

> [W]here a lender subordinates his loan to a securities broker—to enable the broker to comply with regulatory capital requirements—he is estopped from rescinding the subordination agreement. Whether customers relied on the subordination agreement is irrelevant. *Id.* at 596–597.

In *Franklin National*, Judge Enright reached the same result after concluding that 12 U.S.C. § 1823 is part of a regulatory scheme to protect depositors and creditors, not debenture holders.

Ernst & Whinney and Continental argue *Weis* and *Franklin National* are not controlling. They contend that the Supreme Court's decision in *Oppenheimer v. Harriman National Bank & Trust*, 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937) is dispositive.

In *Oppenheimer*, the Supreme Court held that a defrauded stockholder could rescind the fraudulent sale of capital stock by a national bank and share equally in the assets of the bank with other creditors. This right was held to have accrued, however, only after vindication of the regulatory interest by his payment of the statutory lia-

bility to those creditors. *Id.* 213–215, 57 S.Ct. at 723–724.

That the Supreme Court only allowed a change in a shareholder's status after vindication of regulatory interests is important. When the plaintiff in *Oppenheimer* purchased his stock, bank shareholders were individually liable for debts of the bank, up to the par value of their stock. 12 U.S.C. §§ 63 and 64. Congress limited shareholders' individual liability under sections 63 and 64 when it enacted 12 U.S.C. § 64a in 1933 and eliminated all liability under those sections when it repealed them in their entirety in 1959. Pub.L. 86–230, § 7, Sept. 8, 1959, 73 Stat. 457. In limiting and ultimately eliminating those sections, Congress recognized that a federal insurance fund would better serve the interests of guarding depositors from bank closings and restoring confidence in the nation's bank. It was for such a reason that Congress created the Federal Deposit Insurance Corporation in 1933.

In replacing individual shareholder liability with federal insurance, Congress did not, of course, eliminate the regulatory interests discussed in *Oppenheimer*. Rather, it merely transferred those interests to a more centralized location. Therefore, in resolving the Receiver's motion for summary judgment, the Court must determine whether the regulatory interests underlying the creation of the FDIC would be served by permitting defrauded subordinated noteholders to share equally with the FDIC and general creditors in the assets of a closed bank.

Protection of subordinated noteholders was not one of the reasons for creating the FDIC. To the contrary, holders of subordinated notes, as capital investors in banks, serve a function similar to that served by the FDIC in that both noteholders and the FDIC provide protection for depositors and general creditors of banks. To permit holders of subordinated notes to rescind their contractually created obligation on the basis of the fraud of the closed bank would force the FDIC to carry the burden of protection alone *and* to compensate subordinated note-

holders for their losses, as well. Such a result would be contrary to the purposes underlying the creation of the FDIC and would diminish the incentive of capital investors to analyze their agreements with federally insured banks prior to adding to the capital structure of those banks.

Based on the foregoing, the Court holds that rescission is not a remedy available to a defrauded subordinated creditor against the FDIC following the insolvency of a federal regulated and insured financial institution.

### III. *Resolution*

Continental's theory of recovery in this action is based on its contention that it is entitled to share pro rata as a general creditor in the assets of the receivership estate. That theory has been rejected by the Court. Accordingly, the Court hereby GRANTS the Receiver's motion for summary judgment and ORDERS Continental's claims against it DISMISSED. The Court further ORDERS the motions for separate trials and a stay of proceedings filed by Ernst & Whinney and the director defendants DENIED as MOOT. Finally, the Court has SCHEDULED a status conference in this matter for 9:30 A.M., Thursday, June 17, 1982.